## FARGO NAT. BANK v. AGRICULTURAL INS. CO.

### No. 14158.

United States Court of Appeals
Eighth Circuit.

Nov. 1, 1950.

J. F. X. Conmy, Fargo, N. D., for appellant.

Daniel F. Foley, Minneapolis, Minn., for appellee.

Before SANBORN and THOMAS, Circuit Judges, and DEWEY, District Judge.

DEWEY, District Judge.

This is an action by the above named bank against The Agricultural Insurance Company to recover a loss to the bank of $21,055.02, on the ground that the state agent of the insurance company, Mr. Robert Ellis, perpetrated a fraud on the bank through the sale to the bank of forged premium finance contracts which it is claimed was within the scope of his actual or ostensible authority.

At the close of the evidence, the Court directed the jury to return a verdict for the defendant, as in the opinion of the Court the plaintiff had failed to introduce evidence from which a jury could find that the state agent of the Agricultural Insurance Company had either actual or apparent or ostensible authority to discount premium notes on behalf of the defendant. Also, on the ground that the bank itself was guilty of negligence and lack of care which made the loss possible. The plaintiff appeals from the judgment entered on this verdict.

In January, 1947, the insurance company appointed Robert Ellis as its state agent for North Dakota, and the bank knew he had been so appointed. Prior to that time, Mr. Ellis had maintained a general insurance agency business in Fargo, North Dakota and wrote insurance for the defendant company, and other companies. He had a line of agents throughout the state. He did business under the name of "Dakota Gen-

eral Agency", and carried a bank account in the Fargo National Bank under the name of "Dakota General Agency". His appointment as state agent was done orally and any limitations on his authority as such was known only to Mr. Ellis and the insurance company.

. At the time he was appointed state agent the insurance company bought from him the agency plant, the insurance expirations, and the office furniture and fixtures. But the company did not take over his general agency nor operate it as such. Ellis handled the "Dakota General Agency" account after January 1, 1947, just the same as it had been handled before that time.

Funds from several sources were deposited to the account but there is no evidence the Agricultural Insurance Company had any authority over it.

Between January, 1947, and December, 1948, Mr. Ellis, while state agent, sold to the bank fraudulent premium contracts involved in this suit. He had sold similar contracts to the bank prior to 1947, and they had been paid. The proceeds from those sales were deposited in the "Dakota General Agency" account.

Ellis now is in the State Mental Hospital.

While Ellis was state agent, local agents in some instances paid over to him insurance premiums for remittance, for the local agent, to the home office and he often remitted to that insurance company by checks drawn on the "Dakota General Agency".

The finance contracts were on forms which had not been furnished by the Agricultural Insurance Company. The finance contract forms had on the reverse side an "invoice contract form".

The finance contracts had typed upon them "Robert Ellis, State Agent" as well as the name of a purported local agent.

When Mr. Ellis brought the paper to the bank to be sold to it there would be a certificate of insurance attached which would bear the signature of Robert Ellis.

Ellis was authorized to assist local agents in the writing of insurance to the extent that when they had a problem he would advise them. It was no part of Mr. Ellis's duty as state agent to have any contact with the public. That is a field reserved for local agents. Mr. Ellis was paid a straight monthly salary and expenses by the Agricultural Insurance Company. A state agent is a person that represents the company for a given territory and supervises the agents of that company in that territory, such as helping them write insurance and adjust losses and anything that might come up pertaining to their business.

The Agricultural Insurance Company furnished Ellis with forms of certificates of insurance, but there is no evidence that the insurance company knew Ellis had used such forms or sold premium contracts to the bank either before or after he was state agent.

The bank relied on the premium finance contracts, and on the certificates of insurance in the purchase of the contracts, and as being genuine bona fide instruments. However, in truth and in fact, there were no bona fide insurance contracts and the premium finance contracts were forged and the name of the agent thereon fictitious.

In buying these premium finance contracts, the bank did not make any investigation. And at no time did the bank make any investigation to determine the validity of the notes or contracts; or the existence or ownership of the land described in the contracts. Neither did it ever communicate with the Agricultural Insurance Company or any agent thereof, except Ellis, in any matter connected with its purchase of these contracts. The officers of the bank, however, would question Mr. Ellis about matters connected with the premium finance contracts, and Mr. Ellis always had a satisfactory answer to all such questions. The officers of the bank relied upon Mr. Ellis, the certificates of insurance, and the provisions of the finance contracts which provided that the schedule of payments were always ahead of the earned premium, so that adequate time was given for cancellation without penalty, in the event of default of payment. There were occasions when the bank would call the attention of Mr.

Ellis to small discrepancies in the contracts, which with the knowledge of the officials of the bank Mr. Ellis would correct; and if there were discrepancies or errors to a greater extent Mr. Ellis would withdraw the contracts and return later with a new contract without the discrepancies or errors.

The bank would send out a notice to the purported maker of the contract before the due date of the policy payment. These were sent out in an envelope of the Fargo National Bank with a return address. Once in awhile they would get these notices back and they would ask Mr. Ellis about it, and he would furnish a new address and they would send out a new notice which would not be returned.

Payments were received on the premium finance contracts involved in this litigation. Ellis would make these payments and explain to the bank that he was out in the territory all week and he would come in on Friday or Saturday and make several payments, saying that he had picked the money up while out in the various towns during the week. The bank never met any of the alleged makers or had a letter from any of them. The bank examiner did not criticize this paper.

The insurance company never had any communication with the bank regarding Mr. Ellis's affairs until the vice-president called on the bank in January, 1949, after the fraud had been discovered by the bank officials and the insurance company so notified.

The testimony of Mr. Howard D. Berget is important and the following questions and answers are taken from his testimony. After qualifying as an expert in insurance matters, the following occurred:

"Q. I will ask you if you are familiar with the duties and scope of authority generally of state agents operating for fire insurance companies in this territory? A. Yes, I am familiar with it.

"Q. I will ask you if assisting local agents in the production of business is one of the commonly accepted duties and authorities of state agents? A. Yes, it is.

"Q. Well, Mr. Berget, will you tell us, having in mind premium finance notes, or contracts what the custom or practice is in this territory with regard to state agents handling them? A. The general duty of a state agent is to promote the production of business among his agents in his territory and if the production of business in a particular instance should happen to include an element of premium finance one way or the other, then I would say he is certainly acting within his general duties if he does handle, on behalf of his agent, premium finance contracts or time payments.

"Q. Do you know whether or not that is customarily done? A. Yes, it is customarily done.

"Q. By state agents? A. Yes.

"Q. Mr. Berget, does it include paying the money to the state agent and putting it in his personal account? A. I can only cite from my personal experience. There are many state agents who receive moneys belonging to their companies, either from banks or their local agents.

"Q. When a state agent helps in financing a premium note, does the state agent have the money deposited to his personal account in the bank? A. I doubt it very much.

"Q. Do you know of any case where a state agent has assisted in financing a premium note where the money has been deposited to his personal account in the bank? A. I know of several state agents who keep company moneys in their personal accounts. I have no idea where the money comes from, whether it consists of agency balances or premium finance payments.

"Q. But do you know of any case where premium finance notes or money secured on premium finance notes has been deposited by the banker to the credit of the state agent? A. No, I know of no such case.

"Q. Is it customarily done, so far as you know? A. No, I won't say that.

"Q. What will you say? A. I would say that I would have no way of knowing whether the individual bank account was kept in the name of the company or the individual state agent.

"Q. In other words, if money was deposited in a bank account, it might be car-

ried in the name of the insurance company. A. That is right.

"Q. But you do not know of any case where it was deposited in the personal account of the state agent? A. Your question referred specifically to premium finance payments?

"Q. Yes. A. I know of no specific case, no.

"Q. What experience have you had in regard to protection of the financing company, the loaning company, by supplying certificates of insurance without notifying the insurance company? A. Notification is generally mailed out to somebody, some company representative or branch office or home office.

"Q. What do you mean by that? Do you mean that the loaning company generally, on financing a premium note, notifies the home office? A. I didn't say home office. I said either a company branch office or state agency office or the home office, as the case may be, depending on the individual bank.

"Q. Depending on the individual bank? Do you know of any case, where a premium note is financed, where notice is not given to the home office? A. Yes, I do.

"Q. You do know of it? A. Yes.

"Q. Is that general? A. It is general insofar as the one or two banks or other lending agencies that I know of.

"Q. One is the Fargo National, is it? A. No.

"Q. Do you know what other banks do it? A. I know specifically the Dakota National Bank oftentimes will notify either the general agent or the local agent.

"Q. The general agent or the local agent? A. Yes.

"Q. For the local agent? A. Or the local agent.

"Q. But in all cases notice is given to somebody other than the state agent or the party to whom the money is paid, is that right? A. I wouldn't say all cases. I would say—

"Q. (Interrupting) Do you know of any cases where it is not done. A. I pre-

sume that there are some cases where the banks will notify state agents, inasmuch as they are company employees.

"Q. At any time in your experience in the insurance business are premium finance notes handled without giving notice to the alleged maker or checking up to find out if financial solvency or what property he owns? A. I don't think it is common custom, because of the very nature of premium finance contracts, for the banks to pay a great deal of attention to the financial makeup of the party financing the premium. The business of financing premiums is such that the moneys paid—the schedule of payments is always ahead of the earned premium so that adequate time is given for cancellation without penalty in the event of default of payment.

"Q. Do you know of any cases where it is done that way? A. Well, every case is done that way.

"Q. Every case is done that way? For example, can you give us any particular case where it is done that way? A. Well, I have several cases in my office where I have prepared premium finance contracts, taken them over to the bank for discounting, they have remitted to me the net and they never checked with the insured as far as—

"Q. (Interrupting) But you are a local agent, are you not? A. Yes.

"Q. And they do that for the local agent but not for the state agent, isn't that true? A. I wouldn't say that was true.

"Q. In your experience as state agent, did you finance notes and take the money in your own name? A. I never did, no."

■ The jurisdiction of the Court is invoked alone on the diversity of citizenship of the parties, and the amount involved, so that the laws of North Dakota are controlling. Erie R. Co. v. Tomkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 35 C.J.S., Federal Courts, § 170, p. 1244.

One of the statutes of North Dakota provides:

Section "26-0702. Person Handling Insurance is Agent for Company; Exception. Any person who:

"1. Solicits insurance on behalf of any insurance corporation, or on behalf of any person desiring insurance of any kind;

"2. Transmits an application for a policy of insurance, other than for himself, to or from any insurance corporation;

"3. Makes any contract for insurance;

"4. Collects any premium for insurance; or

"5. Aids or assists in any manner in doing any of the things hereinbefore memtioned in this section or in advertising to do any such thing, shall be regarded as the agent of such corporation to all intents and purposes unless it can be shown that he receives no compensation for such services. This section shall not apply to fraternal benefit societies." North Dakota Revised Code of 1943.

The Supreme Court of North Dakota has construed that part of this section which says, "as the agent of such corporation to all intents and purposes", as referring to the relationship of the agent only and not the scope of his authority. Kopald Electric Co. v. Ocean Accident & Guarantee Corporation, Limited, 64 N.D. 213, 251 N.W. 852, 854; Meyer v. National Fire Insurance Co. of Hartford, Conn., 67 N.D. 77, 269 N.W. 845, 849.

██ But other and later cases, hold that these provisions do refer to the scope of the agents authority, and that an agent of an insurance company is such agent "to all intents and purposes": Anderson v. Northwestern Fire & Marine Insurance Co., 51 N.D. 917, 201 N.W. 514, 515; Bekken v. Equitable Life Assurance Society, 70 N.D. 122, 293 N.W. 200; Ulledalen v. United States Fire Insurance Co., 74 N.D. 589, 23 N.W.2d 856; Weber v. United Hardware & Implement Mutuals Co., 75 N.D. 581, 31 N.W.2d 456.

██ "The burden of showing the extent of this authority [of an agent] is upon the one asserting it." Meyer v. National Fire Insurance Co. of Hartford, Conn., supra [67 N.D. 77, 269 N.W. 849].

██ As Ellis as general agent for the Agricultural Insurance Co. aided and assisted the local agents in the making of contracts of insurance, he was within the provisions of the statute, and the agent of such insurance company for all intents and purposes.

A statute of North Dakota provides:

"3-0208, R.C.N.D.1943. Authority to Do Necessary Acts and Make Representations. An agent has authority:

"1. To do everything necessary or proper and usual in the ordinary course of business to effect the purpose of his agency * * *."

██ There is high authority to the effect that an agent does not cease to be an agent acting within the scope of his authority, although he is engaged in a fraud upon a third person.

Restatement of the Law of Agencies, Sections 261 and 262.

"261. Agent's Position Enables Him to Deceive. A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.

"262. Agent Acts for His Own Purposes. A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him under the rule stated in 261, is not relieved from liability by the fact that the apparent agent acts entirely for his own purposes, unless the other has notice of this."

Gleason v. Seaboard Air Lines, 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415; Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757; Aetna Life Insurance Co. v. Mutual Benefit Health & Accident Ass'n, 8 Cir., 82 F.2d 115, 120; 29 Am.Jur. (Insurance) p. 140, Art. 125.

But the agent's actions to be binding on the company must be within the scope of the agent's authority and in the business entrusted to his care.

In 3 C.J.S., Agency, § 255, is the following:

"In order to determine whether an agent's tort was within the scope of his employment, the proper inquiry is: Was the act done in the course of the agency and by virtue of

the authority as agent with a view to the principal's business. It may be stated broadly that the tort of an agent is within the course of his employment where the agent in performing it is endeavoring to promote his principal's business within the scope of the actual or apparent authority conferred upon him for that purpose * * *.

"If the agent steps aside from the principal's business, for however short a time, to do acts not connected with such business, the relation of agency and the agent is for that time suspended, and the agent is not acting within the scope of his employment."

Illustrative of the rule that to bind the principal the authority of the agent must be connected with the business of the principal and within the scope of the agent's authority are in the Dakota cases as follows:

In the Anderson case, supra, an oral agreement to renew a policy of insurance was held within the business of the insurance company. And in the Bekken case, supra, the principal was held liable in damages because of the unreasonable delay of the agent in rejecting an application for life insurance. And in the Ulledalen case, supra, it was held that a parol agreement on behalf of the company to renew a policy of insurance which had expired or was about to expire was within the business of the principal. And in the Weber case, supra, it was held that the action of an agent in waiving a defense to a recovery in an insurance policy was within the scope of his authority.

We, therefore, are confronted with the question whether under the facts and the laws, including the statutes, of North Dakota, Mr. Robert Ellis as state agent for the Agricultural Insurance Company was acting within the business of the insurance company, and within the scope of his actual, or ostensible authority, in selling these premium finance contracts to the bank.

Ellis was invested with authority as state agent to assist soliciting and local agents in selling insurance policies; and as stated by Mr. Berget, his general duties included the promotion and production of business among his agents in his territory, and if production of business in a particular instance should happen to include an element of premium finance, then he would be acting within his general duties if he handled premium finance contracts on behalf of his agents.

It will be noted that Mr. Berget in his evidence was primarily conveying the idea that it was the general duty of a state agent to promote the production of business among his agents; and that his authority to handle premium finance contracts was limited to the promotion and production of business on behalf of his agents.

He did not say, as appellant contends, that one of the general duties of a state agent was to sell premium finance contracts, but that he had the general authority to do so only, or on condition, that it was done in helping a local agent.

In the sale to the bank these premium finance contracts could not in any way benefit the insurance company. Nor if the transaction had been honest could it benefit Mr. Ellis as he was on a salary. The immediate collection of the premiums could only affect a local agent.

Had the sale been made in the process of helping a local agent, although in a fraudulent transaction, it might be considered within the apparent authority of the state agent. But here there is no evidence that Mr. Ellis was attempting to help or benefit any agent, or that the sale was made while helping a local agent, and the bank cannot say that the insurance company mislead it in any way.

It might be argued that as Ellis had authority to execute the insurance certificates in his possession, that in delivering these certificates to the bank he deceived it, and this makes out a case of deceit against his principal.

But the appellant does not rely in its argument here on any deceit on the bank by reason of the insurance certificates. The appellant relies in his argument entirely upon the theory that the state agent had authority either actual or ostensible, to sell the premium certificates to the bank.

However, even though Ellis had authority to execute these certificates of insurance,

his principal would not be liable unless his use of them, as distinguished from his right to execute them, was in the business of his principal, and within the scope of his authority. In this the case differs from the case of Gleason v. Seaboard Air Lines, supra.

■ There is no evidence to support a claim that the sale of these premium contracts to the bank was in the line of the business of the insurance company and within the scope of the authority of the state agent.

Another statute of North Dakota provides: "3-0202. Actual or Ostensible Authority. An agent has such authority as the principal actually or ostensibly confers upon him. Actual authority is such as a principal intentionally confers upon the agent or intentionally or by want of ordinary care allows the agent to believe himself to possess. Ostensible authority is such as the principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess." North Dakota Revised Code of 1943.

Our attention has not been called to any interpretation of this statute 3-0202 by the Supreme Court of North Dakota nor have we been able by independent research to find any.

It is expressly held by the statute that "an agent has such authority as the principal actually or ostensibly confers upon him".

It would appear therefore that an agent has no authority other than that conferred upon him by this statute.

The question for determination is also covered by this statute.

Evidence is lacking to bring the case within the definition of actual or ostensible authority as defined in Section 3-0202, supra.

The Trial Court also was of the opinion that the evidence conclusively showed that the bank was itself guilty of negligence in the transaction which prevents recovery. This also is covered by a statute of North Dakota, Section 3-0303, which reads as follows: "When Ostensible Authority Bind-ing. A principal is bound by acts of his agent under a merely ostensible authority to these persons only who in good faith and without ordinary negligence have incurred a liability or parted with value upon the faith thereof." North Dakota Revised Code of 1943.

Recovery under this statute could be had under the ostensible authority of an agent only by those who without ordinary negligence have parted with value upon the faith of ostensible authority of the agent.

■ The evidence discloses that: These transactions had been carried on for several years, and prior to 1947, without any investigation on the part of the bank as to the contracts being bona fide although it could easily have been done; the transactions were substantial in business and amount; some of the contracts were changed in minor particulars in the presence of the officers of the bank; no purported maker or soliciting agent was ever seen, contacted or investigated; no investigation was made as to security; and there was no investigation of any kind or with anyone connected with the transactions except Mr. Ellis.

No purported maker of the contracts ever appeared or responded to any notices sent out by the bank, or otherwise; no attention was given to the fact that often the paper became past due nor that the purchase price of the contracts was deposited in the account of "Dakota General Agency", and it would appear that the bank relied entirely upon the honesty and integrity of Mr. Ellis and that confidence was badly outraged by him.

■ There is another reason why the judgment appealed from should not be reversed. Whether the bank, under the evidence, had made a case for the jury presented a doubtful question of North Dakota law. This Court has repeatedly announced that, upon the review of doubtful questions of local law, it will accept the considered opinion of the local trial judge unless convinced of error. Russell v. Turner, 8 Cir., 148 F.2d 562, 564; Northern Liquid Gas Co. v. Hildreth, 8 Cir., 180 F.2d 330, 336; Nolley v.

Chicago, M., St. P. & P. R. Co., 8 Cir., 183 F.2d 566, 572.

The judgment appealed from should be and the same is hereby affirmed.

Affirmed.