57 So.2d 23 (1952)
INDUSTRIAL INS. CO. OF NEW JERSEY
v.
FIRST NAT. BANK OF MIAMI et al.
Supreme Court of Florida, Division A.
February 22, 1952.
Blackwell, Walker & Gray, Miami, and Whitfield, Musgrave, Selvy, Fillmore & Kelly, Des Moines, Iowa, for appellant.
Loftin, Anderson, Scott, McCarthy & Preston, Miami, for appellee.
THOMAS, Justice.
Insurance policies indemnifying property owners for loss from fire are usually written for one year for a stated amount, but there is an appreciable reduction in the total premium if the policies are taken for three or five-year periods. For illustration, *24 the cost of a policy for a three-year period is five-sixths as much as one taken for three separate years; the cost of a policy for a five-year period is the same as the total of four yearly premiums for the same policy if taken for four separate years. Many owners cannot afford the larger outlay in cash, so to take advantage of the discount, they borrow against the policies, profiting by the difference between the saving in premiums and the interest on the loans made to them. From the financing of policy holders in this situation by the First National Bank of Miami, and another bank later merged with it, this suit arose.
Lotspeich-Bush, Inc., evidently personified by J.B. Bush, was the authorized and legalized local agent for the appellant, Industrial Insurance Company, successor of National Fire and Marine Insurance Company. Thrall General Agency, Inc. was the state agent for appellant with reference to business transacted by Lotspeich-Bush, Inc.
From here on, in an attempt to simplify the transactions, we shall refer to the principal transactors as "the bank," "Industrial," "Thrall," and "Bush."
Hundreds of policies were written by Bush as agent of Industrial, and finance notes to cover the premium purportedly signed by the policy holders, were delivered by Bush to the bank.
In a typical policy loan transaction, the assured would pay one-fourth the premium in cash and sign a "premium contract" reciting that in consideration of the bank's paying to Industrial the remaining three-fourths, the assured would pay the bank that amount in equal periodic installments. The assured assigned to the bank, as collateral, such part of any refunds, or proceeds in the event of loss, as would reimburse the bank. Also, in default of the payment of any installment, the bank was authorized to cancel the policy and apply the unearned premium to the debt.
Attached to the contract was the "Agent's Statement" certifying that the policy was genuine, that the down payment had been received, and that an endorsement had been placed on the policy showing the bank's financing and its right under relevant circumstances to cancel the insurance contract. This endorsement contained the statement that "Said agreement [of financing with the bank] assigns to the Bank all return premiums payable on this policy, and an amount out of the proceeds payable in the event of a loss, if the unearned premium be thereby reduced, as shall be required to pay all sums owing to the Bank under said agreement." Also, in the statement, executed by Bush in behalf of his corporation, was the promise immediately to notify the bank of any change in the policy that would affect the security of the bank.
Immediately after execution of the note with attached statement, the bank would address a communication to Thrall advising of the financing of the policy and expressing a purpose to pay to Bush, or to Thrall, the amount of the premium as Thrall might direct "on the enclosed duplicate" of the letter of notification. Then would appear the endorsement by Thrall, as agent for Industrial, directing the payment of the premiums "to our above-named agent (the undersigned)." Following this, the bank would address a letter to Bush enclosing a check for three-fourths of the premium. It will be noted that the words in parentheses are not stricken, but this is unimportant because Thrall did not receive the proceeds and apparently did not object to the manner of remitting direct to Bush. These checks of the bank issued to Bush's corporation for the amounts of the loans were deposited in the personal account of Bush, who remitted monthly to Thrall against accounts stated by Thrall.
Many policies, thus financed by the bank, were canceled without the bank's knowledge, and although the unearned premiums should have been returned to the bank, they were, instead, credited by Industrial to Thrall, and by Thrall to Bush. The bank was, therefore, circumvented to an extent not precisely known to it; so this suit was brought for an accounting, a discovery, and a decree for recovery of such sums as it had been deprived of by the triple play: *25 Industrial to Thrall to Bush. In few words, the premiums were not paid to the bank, but were credited to Bush's account.
The upshot of an inquiry, conducted by a master in chancery, which appears to have been quite thorough, was a decree in favor of the bank for about $50,000 against Industrial, Thrall and Bush, severally; and a denial of the bank's request for attorneys' fees.
Doubtless, Bush acted in a devious way to short-circuit the bank, but there is no need now to elaborate on the misconduct of his affairs or his breach of faith with the institution which must have contributed materially to the enhancement of his business and that of his employer. We are immediately concerned with the propriety of the chancellor's decree fixing the blame and disallowing the fee. One question is presented by the appellant, the other by appellee.
It is appellant's contention that because the premium contract bore the stipulation that the solicitor of the insurance, Bush, was not the agent of the bank, and because the "Agent's Statement" appended to the contract recited that the signatory, individually, and not as agent of the carrier, made certain representations, Bush was either the agent of the assured in each case or a principal. This view, if sustained, would, of course, be very comforting to Industrial and Thrall. But if this interpretation were accepted, it would immediately be wondered why Thrall, as general agent for Industrial, was exercising in each case the prerogative of instructing the bank about paying the money to its "agent" Bush or to Industrial and exercising the option by directing payment to the former, expressly describing Bush as "our above-named agent." If Bush was a principal, or a representative of the bank, such procedure would have been utterly useless, and the idea seems inconsistent with the dealings between Bush and Industrial. Bush remitted to Industrial the remainder of premiums after deducting his commissions. Upon one occasion the bank wrote Industrial for information about canceled policies and was advised that Thrall had the intelligence about them and was being directed to furnish it to the bank. So both Thrall and Bush were identified as agents of Industrial.
In its brief, the appellant has presented sixteen questions involving various phases of the series of transactions among Industrial, Thrall, Bush, and the bank. Some of them are based on isolated instances, the handling of individual policies. But we think it is unnecessary to discuss and decide seriatim the questions and the instances, because of our conviction from a study of the record that the general pattern of the transactions is so well established and the underlying principle so clearly developed as plainly to present for determination of the court the axial problem, namely, the resting place of responsibility for the misdoings of Bush that resulted in loss to the bank.
In making this observation, we do not overlook the probability that the policies involved fall in five categories: contracts canceled with refunds to Bush; policies never actually issued; policies claimed by Industrial to have been improperly canceled; policies validly canceled on which refunds are due; and duplication of contracts.
We think this responsibility may not be shunted from Industrial to the bank on the theories that Bush was the bank's agent, or that the bank was so negligent in determining Bush's authority to act for Industrial that it should not have prevailed in the suit. Thrall's recognition of the dealings and Bush's part in them and Industrial's recognition of Thrall really reduce the whole affair to simplicity itself, and in our opinion present a typical case for accounting and recovery of the amount due the bank.
We have not been convinced that any importance should be attached to the language following the "Agent's Statement" on some of the premium contracts, that "All installments under this Contract should be remitted to Lotspeich-Bush, Inc. * * *." Parenthetically, such was the phraseology on the premium contracts of American National Bank, with which First National *26 Bank was merged, while the contracts of the latter contained the identical stipulation except that the name of the bank appeared instead of "Lotspeich-Bush, Inc."
We agree with appellee that from the norm of the procedure and especially from the facts that there was no direction to the company to credit unearned premiums to Bush, and that notice was given to the assureds (after receipt of directions from Thrall) to make payments to the bank, this discrepancy is reduced to nothingness.
Our reaction to the facts and the presentations of counsel is that the stream moved quite smoothly while the bank's funds were flowing into the coffers of Industrial and, incidentally, profiting Thrall and Bush, but that things went awry whenever the course was reversed. Also, we are convinced that Industrial sponsored Bush for the purpose of augmenting its business through his efforts, but disowned him when his irregular practices were discovered and the time came to fix the responsibility for the losses from his delinquencies, which could have been prevented, or the evil effect of which could have been diminished had Industrial properly handled the refunds by sending them to the bank instead of giving its agent credit for them.
We decided long ago, in Aetna Ins. Co. v. Holmes, 59 Fla. 116, 52 So. 801, 802, that "`The acts of an agent, performed within the scope of his real or apparent authority, are binding upon his principal'" and further that "`The public have a right to rely upon an agent's apparent authority, and are not bound to inquire as to his special power, unless the circumstances are such as to put them upon inquiry.'" The court was quoting charges which it approved.
In the Restatement of the Law of Agency, we find, Sec. 261, that "A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." In the following section of the same work appears the statement that "A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him, under the rule stated in Sec. 261, is not relieved from liability by the fact that the apparent agent acts entirely for his own purposes, unless the other has notice of this."
We think what we have quoted is peculiarly fitting in this case because Industrial held out Bush as its agent and there was nothing to convince master or chancellor that the bank had notice of Bush's acting "entirely for his own purposes," much less that he was committing fraud.
Concluding as we do that no error was shown by appellants to have been committed, we arrive now at the question submitted by the appellee. It is insisted by it that compensation should have been allowed its attorneys under Section 625.08, Florida Statutes 1949, and F.S.A., providing that a decree in favor of a beneficiary under a contract of insurance against an insurer shall include a fee for the beneficiary's attorney.
We do not consider that the bank was a beneficiary. It stood in the beneficiary's shoes only to the extent of being entitled to refunds and proceeds to secure the payment of the loans to beneficiaries. Actually, some amounts found to be due the bank on the accounting were for policies that never issued, duplicate policies and so forth. This controversy was one between the appellee in its own behalf and the appellants for monies that had miscarried. In numerous instances, the bank's claims were not based on outstanding policies for the reasons that policies had not been issued in the first place, or if issued, had been canceled.
We think the bank properly recovered, but that the statute cannot be so liberally construed as to require a revision of the decree to include attorneys' fees.
The final decree in all respects is
Affirmed.
SEBRING, C.J., and TERRELL and HOBSON, JJ., concur.