New England Acceptance Corp. *v.* Amer. Manufacturers Mut. Ins. Co.

NEW ENGLAND ACCEPTANCE CORPORATION *vs.* AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY & another.[1]

Suffolk.    December 11, 1975. — March 19, 1976.

Present: ROSE, KEVILLE, & ARMSTRONG, JJ.

*Practice, Civil,* Auditor: findings. *Insurance,* Agent. *Agency,* Scope of authority, Insurance agent, Agent's fraud. *Fraud.*

Two insurance companies whose duly licensed agents, without knowledge of the companies, had obtained money from an insurance premium finance company by a fraudulent scheme were liable to the finance company for its loss. [180-181]

CONTRACT OR TORT. Writ in the Municipal Court of the City of Boston dated September 19, 1969.

Upon removal to the Superior Court the action was tried before *Ponte,* J.

*Benjamin Goldman* (*Jacob Shair* with him) for the plaintiff.

*John J. C. Herlihy* for the defendants.

ARMSTRONG, J.    This is an action to recover $35,718.76 paid by the plaintiff, an insurance premium finance company, to two insurance agents, the brothers Ducott. A jury returned verdicts against the Ducotts on four counts of the declaration, one of which alleged that the money had been obtained by a fraudulent scheme whereby the Ducotts sold to the plaintiff forged promissory notes secured by nonexistent insurance policies purportedly written by the Ducotts on behalf of the defendant insurance companies (the companies). Judgments were entered for the plaintiff against the Ducotts in accordance with those ver-

---

[1] American Motorists Insurance Company.

4 Mass. App. Ct. 172                                  173

New England Acceptance Corp. *v.* Amer. Manufacturers Mut. Ins. Co.

dicts. No appeal was taken from those judgments, and no question remains as to the nefarious character of the Ducotts' conduct or their liability for the sums paid them. Rather, the question before us is whether the companies, which knew nothing of the Ducotts' frauds and revoked their agency agreements after learning of them, are similarly liable to the plaintiff for its losses.

The case was initially tried to an auditor (facts not final) before July 1, 1974 (see Mass.R.Civ.P. 1A, subpar. 5, 365 Mass. 732 [1974]), and the auditor found for the plaintiff against both the companies and the Ducotts. The jury trial occurred after that date (*ibid.*), and the auditor's report, together with the testimony of two witnesses and numerous exhibits, was admitted in evidence. The trial judge denied motions by the plaintiff and the companies for directed verdicts, and submitted the case against the companies to the jury in the form of three questions (Mass.R.Civ.P. 49[a], 365 Mass. 812 [1974]), by which the jury were asked to decide (1) whether the Ducotts had authority, actual or apparent, to act for the companies in the transactions at issue,[2] (2) whether the plaintiff was estopped to assert its claim against the companies, and (3) whether the plaintiff was contributorily negligent. The jury returned special verdicts adverse to the plaintiff on all three questions. The judge, on the plaintiff's motion that verdicts to the contrary on all three questions be directed, then ordered the substitution of negative answers to the second and third questions but refused to disturb the jury's negative answer to the question pertaining to the Ducotts' authority. The judge also denied the plaintiff's motions for a judgment against the companies notwithstanding the verdict and for a new trial, and entered

---

[2] The question was worded: "As the duly licensed insurance agents of the two defendant insurance companies, were the ... Ducott[s] acting within the scope of their authority when they sold the notes in issue to the plaintiff and made the representations to the plaintiff concerning the validity of those notes and the insurance policies described in the said notes?" It is clear from the judge's charge that the question was intended to embrace the concept of apparent (as well as actual) authority, and we assume that the jury so interpreted it.

174                                     4 Mass. App. Ct. 172

New England Acceptance Corp. *v.* Amer. Manufacturers Mut. Ins. Co.

a judgment for the companies. The plaintiff appeals from that judgment and from the order denying its motion for a new trial.[3] The companies appeal from the judge's order that negative answers be entered in place of the special verdicts returned by the jury in response to the questions relating to estoppel and contributory negligence.

We are of the opinion that the plaintiff's motion for judgment against the companies notwithstanding the verdict was improperly denied. We base our opinion on the subsidiary findings of the auditor and on what transpired at the ensuing jury trial. The auditor's subsidiary findings may be summarized as follows.[4]

At all material times the Ducotts were the duly licensed insurance agents of the companies, which had applied for such licenses from the Commissioner of Insurance in accordance with G. L. c. 175, § 163, and vouched for the character of the Ducotts in so doing. While the Ducotts had a written agency agreement with each of the companies, the plaintiff was not acquainted with the terms of those agreements or aware of any restrictions on the Ducotts' authority contained therein. The Ducotts did have authority

---

[3] The plaintiff's notice of appeal also enumerates various pre-judgment interlocutory orders. Those orders are reviewable on the appeal from the judgment and we therefore do not treat the plaintiff's enumeration of them as separate appeals. See Mass.R.A.P. 3(a), 365 Mass. 845 (1974).

[4] We omit from our summary certain statements included among the auditor's subsidiary findings which appear to be nothing more than inferences drawn by him from other subsidiary findings. See *Cook* v. *Farm Serv. Stores, Inc.* 301 Mass. 564, 568 (1938). We also omit "subsidiary findings" which we take to be conclusions of fact or rulings of law. See *LiDonni, Inc.* v. *Hart,* 355 Mass. 580, 583 (1969). Nor do we include any of the auditor's "general and ultimate findings," which were stated to have been based on the "subsidiary facts and the reasonable inferences to be drawn therefrom." *Moore* v. *Worcester Insulation Co. Inc.* 338 Mass. 44, 46-47 (1958). *State Line Contractors, Inc.* v. *Commonwealth,* 356 Mass. 306, 318-319 (1969). The companies preserved their rights with regard to those "findings" by moving to strike them from the report. See *Blackmer* v. *Toohil,* 343 Mass. 269, 271 (1961). While the judge initially denied that motion as to all but a few of the challenged "findings," he impliedly reversed himself thereafter by treating the subject matter of the relevant "findings" as open for consideration by the jury.

to issue and execute insurance policies on behalf of both companies and had been given blank policies to fill out and sign. They were required to send a copy of any policy written by them to the issuing company and to file monthly reports with each company containing a recitation of premiums collected and other information. A field man from the home office of the companies (which appear to be affiliated) made triweekly checks on the affairs of their agents.

The plaintiff was an insurance premium finance agency licensed under G. L. c. 255C, inserted by St. 1964, c. 727, § 1. Its Boston office was headed by one Trainor, a vice-president of the plaintiff. In 1967 and 1968 Trainor, having satisfied himself by an examination of the records of the Commissioner of Insurance that the Ducotts were the duly licensed agents of the companies, took assignments on behalf of the plaintiff of many notes secured by insurance policies supposedly issued by the Ducotts for one or the other of the companies. Each of the notes was ostensibly signed by an insured as maker, was payable to the order of the Ducott agency in monthly installments, recited the particulars of the policy and contained a warranty by the Ducotts as to the validity of the note itself and of the policy securing it.[5] As each note was assigned to the plaintiff, Trainor would write a check in the amount of the premium due, payable to the order of the Ducott agency, and the check would be deposited in the Ducotts' bank account. Trainor would then forward the note to the plaintiff's home office, which would send the insurer a card describing the transaction, setting forth the particulars of the policy or policies taken as security (including policy number and name of insured), and requesting notification of any change in the policy provisions and of any cancellation or loss.

---

[5] The security was in the return premium payable in the event of cancellation of the policy. The maker of the note (the insured) authorized the holder to effect cancellation in the event of nonpayment of any installment and to receive any return premium from the company.

It had long been the practice in the insurance business for insurance companies to recognize and cooperate with premium finance agencies, and to honor requests by those agencies for cancellation and reinstatement of policies. The defendant companies were at all times aware that the financing of insurance premiums by firms such as the plaintiff was a method commonly employed in effecting sales of policies and the payment of premiums thereon. They were also aware that the plaintiff was paying the Ducotts the full premium in each instance, and never questioned or objected to this practice. However, although the companies received all the notices of premium financing sent to them by the plaintiff, and thereby had the means of knowing that the Ducotts had been paid premiums on nonexistent policies, the companies in practice merely filed the notices away, apparently without examination, and never advised the plaintiff of any discrepancy.

In most instances payments on the notes assigned by the Ducotts to the plaintiff were made promptly and regularly. But in the case of thirty of the notes, payments ceased in May, 1969. An investigation thereafter disclosed that the fifty-eight policies described in those notes had never been issued and that the Ducotts had never intended to issue them. The thirty notes were therefore unsecured, and the plaintiff's efforts to collect the amounts due thereon from the supposed makers and from the companies proved unavailing.

When the plaintiff purchased the notes it relied on the Ducotts' representations as to their genuineness and the existence of the policies. The latter was of utmost importance to the plaintiff, as the existence of valuable security rendered the identity and financial status of the insureds of little or no importance to it. The plaintiff also relied on the fact that the Ducotts were the duly licensed agents of the companies and on the assumption that these transactions were being conducted by the Ducotts in their capacity as such. The plaintiff would not otherwise have purchased the notes. Until the investigation in 1969, the

plaintiff had enjoyed good relations with the Ducotts and had no reason to suspect their integrity.

At the jury trial the plaintiff introduced the auditor's report in evidence and rested. The companies elicited testimony from Trainor and from an officer of the two companies which was largely confirmatory of the auditor's findings. The companies also introduced each of the thirty spurious notes in evidence. In doing so attention was called to certain errors and omissions on some of the notes, which may have raised a question as to whether the plaintiff's reliance on the Ducotts' representations regarding the notes and policies was justified. That question, however, would affect the liability of the Ducotts and the companies equally, and the verdicts returned by the jury against the Ducotts laid it to rest. There was no other evidence presented to the jury to controvert or limit the auditor's findings.

The auditor's remaining findings, as outlined above, were therefore conclusive, because no evidence had been introduced to dissipate their prima facie effect. See G. L. c. 221, § 56, as in effect prior to July 1, 1974; Mass.R.Civ.P. 53 (e) (3), as amended, 367 Mass. 917 (1975); *Cook* v. *Farm Serv. Stores, Inc.* 301 Mass. 564, 566 (1938). The evidence presented no other question of fact to be submitted to the jury.

On the basis of the auditor's findings, coupled with the verdicts against the Ducotts, we hold the companies to be liable for the conduct of the Ducotts as a matter of law. In the first place we are of the opinion that the Ducotts were at least impliedly authorized by the companies to engage in legitimate premium financing transactions as the companies' agents. It is to be emphasized that the Ducotts were licensed as insurance *agents* and hence as representatives of the companies rather than of their customers; they are to be distinguished from insurance *brokers*, who represent the customers for most purposes rather than the company. See G. L. c. 175, § 162; *Ritson* v. *Atlas Assur. Co. Ltd.* 279 Mass. 385, 392 (1932). The

Ducotts were thereby constituted the agents of each of the companies in the Commonwealth "for the transaction of such business as it [was] authorized to transact therein." G. L. c. 175, § 163. A primary function of an insurance agent so licensed, though by no means his only function (see *Green* v. *Star Fire Ins. Co.* 190 Mass. 586, 594-595 [1906]), is to sell insurance on behalf of the company he represents, and, as a part of that function, he can bind his company by commitments made by him for the issuance of policies (*Shumway* v. *Home Fire & Marine Ins. Co.* 301 Mass. 391, 394 [1938]) and by representations that policies have in fact been issued (see *Merolla* v. *Talman & Johnson Ins. Agency, Inc.* 354 Mass. 300, 302-303 [1968]). In short, under well settled principles of agency law, the authority of an insurance agent to sell insurance, unless limited by his principal, includes authority to do all acts which are incidental thereto or are reasonably necessary to effect such sales. See *McQuade* v. *Springfield Safe Deposit & Trust Co.* 333 Mass. 229, 233-234 (1955); *Kaufman* v. *Leard,* 356 Mass. 163, 167-168 (1969); *Cellucci* v. *Sun Oil Co.* 368 Mass. 811 (1975).

We have no difficulty in classifying an insurance agent's arranging for premium financing as being within the scope of that broad authority, despite the fact that we can discover no Massachusetts case to that effect and despite the conflict on that point which appears to exist in other jurisdictions. Compare *Industrial Ins. Co.* v. *First Natl. Bank,* 57 So. 2d 23, 25-26 (Fla. 1952), with *National Premium Budget Plan Corp.* v. *National Fire Ins. Co.,* 106 N. J. Super. 238, 241-242, cert. den. 54 N. J. 515 (1969). The companies contend, however, that the financing of premiums is an act separate and distinct from the sale of insurance, and that an agent is acting for the insured or for himself, rather than for his company, in so doing. While that contention is not lacking in plausibility, and indeed is supported by the New Jersey case cited above, and perhaps by *First Trust & Deposit Co.* v. *Middlesex Mut. Fire Ins. Co.* 259 App. Div. 80, 88, affd. 284 N. Y. 747 (1940), we cannot reconcile the restrictive view of implied

authority represented by those cases with the broader concept applied in our own law.

A particular difficulty in the companies' attempt to carve out such an exception to the broad scope of an insurance agency in this State lies in G. L. c. 175, § 162B, inserted by St. 1954, c. 464. Section 162B, in so far as material, provides: "Insurance agents and brokers may accept payment of insurance premiums in installments to be evidenced by notes or other appropriate instruments running from the insured to the agent or broker.... For the purposes of financing insurance premiums and the subsequent sale or other negotiation of any such note or instrument to a third party, insurance agents and brokers shall be considered to be sellers of insurance." The companies correctly point out that the underlying purpose of § 162B was to exempt premium financing transactions from the Massachusetts small loans act, whose provisions "shall not apply in the case of any transaction which involves any note or other instrument evidencing the indebtedness of a buyer to the seller of ... insurance for a part or all of the purchase price...." G. L. c. 140, § 96. See Marryott, Insurance, 1 Annual Survey of Massachusetts Law, § 18.1 (1954). And see 1954 House Doc. Nos. 901, 1609, 2429, 2496; 1954 Senate Doc. No. 671. Obviously the language of the second of the quoted sentences of G. L. c. 175, § 162B, was patterned after the language of the quoted exemption in G. L. c. 140, § 96. The same purpose would have been served, however, by declaring that insurance agents and brokers engaged in premium financing should be considered "buyers" of insurance (or alternatively that the small loans law should not apply to premium financing by agents and brokers). In our view the language chosen by the Legislature in enacting § 162B amounted to recognition of two propositions relevant to this case: (1) that a note received by an agent or broker on account of an insurance premium constitutes payment and is the property of the company, and (2) that the sale or negotiation of such a note is a part of the process of selling the insurance to which it relates. Thus, by opera-

tion of § 162B as we interpret it, the Ducotts had authority to arrange for the financing of premiums in their capacity as agents for the companies.

We reach the same conclusion by considering the fact that each of the agency agreements with the Ducotts provided that "[p]remiums received by [a]gent are the property of [c]ompany and shall be held by [a]gent as trustee for [c]ompany until delivered to [c]ompany." The delivery of a premium financing note by an insured to the Ducotts is presumed to have constituted payment of the premium (*Reed* v. *Upton*, 10 Pick. 522, 524 [1830]), and the note must therefore be considered the property of the company. The Ducotts' long standing practice, known to the companies, of selling such notes to premium finance companies and receiving the proceeds thereof must be taken to be within the scope of their authority. See *Commonwealth* v. *Beneficial Fin. Co.* 360 Mass. 188, 357 (1971), cert. den. sub nom. *Farrell* v. *Massachusetts*, 407 U. S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U. S. 914 (1972), and cases cited; *LaBonte* v. *White Constr. Co. Inc.* 363 Mass. 41, 44-45 (1973), and cases cited; Restatement 2d: Agency, § 43 (1958). Cf. *White* v. *Connecticut Fire Ins. Co.* 120 Mass. 330, 332 (1876).

On the facts before us, then, the Ducotts appeared to be acting within the scope of their agency when they perpetrated their sequence of frauds upon the plaintiff. Having put the Ducotts in a position to commit the fraud while apparently acting for the companies, the companies are liable to the plaintiff for the losses sustained thereby. *Haskell* v. *Starbird*, 152 Mass. 117, 120-121 (1890). *Bockser* v. *Dorchester Mut. Fire Ins. Co.* 327 Mass. 473, 477-478 (1951). Restatement 2d: Agency, § 261 (1958). Compare *Cellucci* v. *Sun Oil Co.* 2 Mass. App. Ct. 722, 730 (1974), *S. C.* 368 Mass. 811 (1975). Such liability attaches without regard to whether the companies received any benefit from the transactions and regardless of the fact that the Ducotts were acting entirely for their own purposes in selling the fraudulent notes. *McCarthy* v. *Brockton Natl. Bank*,

314 Mass. 318, 325-326 (1943). Restatement 2d: Agency, § 262 (1958). The courts of at least two jurisdictions have imposed liability on that theory in cases factually very similar to the present one. See *Industrial Ins. Co.* v. *First Natl. Bank,* 57 So. 2d 23 (Fla. 1952); *Fidelity Natl. Bank* v. *Central Manufacturers Mut. Ins. Co.* 48 So. 2d 668 (La. App. 1950). As to *Fargo Natl. Bank* v. *Agricultural Ins. Co.* 184 F. 2d 676, 681-683 (8th Cir. 1950), relied upon by the companies, its apparent holding that an insurance company is not liable for the authorized acts of its agent when those acts are performed with ulterior motives is, we think, contrary to the law of Massachusetts.

The companies argue finally that the plaintiff's recovery from them is foreclosed by the jury's special verdict (rejected by the trial judge) that the plaintiff was guilty of contributory negligence. The thrust of the argument appears to be that such a verdict was warranted by the plaintiff's failure to investigate the truth of the Ducotts' representations. To be sure, the argument finds support in such cases of other jurisdictions as the *Fargo Natl. Bank* case at 683, and the *First Trust & Deposit Co.* case, 259 App. Div. at 87-88 (N. Y.). But the first of those cases was decided under a North Dakota statute[6] and the other appears to have been based on a rule of common law not applicable in this Commonwealth. The Massachusetts rule is that "[t]he recipient in a business transaction of a fraudulent misrepresentation of fact is justified in relying on its truth, although he might have ascertained the falsity of the representation had he made an investigation." *Yorke* v. *Taylor,* 332 Mass. 368, 374 (1955). *Snyder* v. *Sperry & Hutchinson Co.* 368 Mass. 433, 446 (1975). Restatement: Torts, § 540 (1938). Applying that rule to the present case, we are satisfied that the defense here relied upon by the companies was no defense at all, and that the

---

[6] "A principal is bound by acts of his agent under a merely ostensible authority to those persons only who in good faith *and without ordinary negligence* have incurred a liability or parted with value upon the faith thereof" (emphasis supplied). North Dakota Rev. Code of 1943, § 3-0303.

judge properly withdrew the question of contributory negligence from the jury.

In view of our conclusion that the plaintiff was entitled to a judgment against the companies notwithstanding the verdict, we need not consider the other issues argued in its brief and we treat its appeal from the order denying its motion for a new trial as waived. The special verdict in response to jury question one is set aside, the judgment for the companies is reversed, judgment is to be entered for the plaintiff against the companies in the amount of the respective claims against them, with interest, and the plaintiff's appeal from the order denying its motion for a new trial is dismissed.

*So ordered.*