VERANDA BEACH CLUB LIMITED PARTNERSHIP, Plaintiff, Appellee,

v.

WESTERN SURETY CO., et al., Defendants, Appellees,

FRG Ventures, Inc., Plaintiff, Appellant.

VERANDA BEACH CLUB LIMITED PARTNERSHIP, Plaintiff, Appellee,

v.

WESTERN SURETY CO., et al., Defendants, Appellees,

Robert F. Mongillo, Defendant, Appellant.

VERANDA BEACH CLUB LIMITED PARTNERSHIP, Plaintiff, Appellee,

v.

WESTERN SURETY CO., et al., Defendants, Appellees,

Faneuil Hall Capital Group, Inc., Plaintiff, Appellant.

Nos. 90–1096 to 90–1099, 90–1857, 90–1871 and 90–1872.

United States Court of Appeals, First Circuit.

Heard April 1, 1991.

Decided June 10, 1991.

Robert J. Kaler, with whom Lauren E. Duca, and Gadsby & Hannah were on brief, Boston, Mass., for plaintiff Faneuil Hall Capital Group, Inc.

James E. Carroll, with whom Peabody & Arnold was on brief, for defendant Robert F. Mongillo.

Frederic N. Halstrom, with whom Halstrom Law Offices, P.C. was on brief, Boston, Mass., for defendant Western Sur. Co.

Philip J. Crowe, Jr., with whom Elizabeth N. Mulvey and Lubin & Meyer, P.C. were on brief, Boston, Mass., for plaintiff FRG Ventures, Inc.

Walter R. May, Jr., with whom James E. Carroll and Peabody & Arnold were on brief, Boston, Mass., for defendant Edward W. Mongillo Co.

Before CAMPBELL, SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.

We confront today three separate sets of appeals, all of which relate to a multifaceted judgment entered in the United States District Court for the District of Massachusetts. The two civil actions that underlie the judgment had as their provenance a failed commercial transaction. The jury found in favor of plaintiff FRG Ventures, Inc. (FRG) against defendant Robert Mon-

gillo (Mongillo). The remaining defendants, Edward W. Mongillo Company (EWM Co.) and Western Surety Company, went scot free. Another plaintiff, Faneuil Hall Capital Group, Inc. (Faneuil), took nothing. FRG, Mongillo, and Faneuil appeal. Having cut a passable swath through the jungle of charges and countercharges, we conclude that no reversible error occurred. Hence, we affirm the judgment below.

## I. BACKGROUND

Although more intricate details of this star-crossed transaction will emerge in connection with our discussion of specific issues, we start by sketching the evidence.

The Veranda Beach Club is a luxury time-share resort located on oceanfront property in Longboat Key, Florida. In the spring of 1983, Peter Peggs and Peter Hutchings, FRG's principals, began to investigate the possibility of purchasing it. They formed the Veranda Beach Club Limited Partnership (VBCLP) for the sole purpose of acquiring equity in the resort. FRG, a Massachusetts corporation, was the general partner. Through Peggs and Hutchings, it negotiated with the club's owner, Vacation Equities, Inc. (VacEq), finally reaching an agreement that provided for the purchase of all ownership intervals (sometimes called "unit weeks") unsold as of the closing date.[1]

FRG hired Faneuil to secure the necessary financing. Faneuil arranged a loan from the Union Trust Bank of Baltimore for slightly over $4,000,000. There was, however, a very large fly in the ointment: as a condition precedent to the loan, Union Trust required a bond guaranteeing full repayment of the balance. Faneuil began hunting for such a bond. In December 1983, John Eller, Faneuil's executive vice president, met Mongillo at a Christmas party. Mongillo was an employee of EWM Co. He was also a close friend of Carmen Elio, Faneuil's president, and an authorized agent of Western Surety. Upon learning

of the need for a bond, Mongillo suggested that Insurance Risk Management, Inc. (IRM), a firm that he owned, could provide one underwritten by Western Surety. Eller encouraged him to try and sent him an information packet.

Within a month, Mongillo forwarded Faneuil a sample Western Surety bond and some supporting documentation (including a letter on Western Surety stationery, supposedly signed by a corporate official but actually forged by Mongillo, announcing Western Surety's "willingness" to write the desired bond). The documentation indicated that IRM would arrange for Western Surety to issue a financial guaranty bond to Union Trust. Based on these representations, and unaware that Mongillo was playing a rogue's game, Faneuil structured a transaction in which Union Trust would make the loan to VBCLP and Western Surety would issue a bond backing the repayment obligation. The closing was to take place in stages. The loan documents were to be executed in Baltimore. The real estate documents were to be recorded on the next day in Florida, and the seller paid.

When the closing convened in Baltimore on April 25, 1984, Mongillo delivered an apparently authentic Western Surety bond in the amount of $4,300,000. As the closing progressed, the bankers raised a question concerning the amount of flood insurance on the property. Mongillo stated that he could obtain additional coverage if necessary. After Mongillo departed, Union Trust decided to contact Western Surety directly to discuss the flood insurance situation. The cat soon came clear of the bag. The bond and accompanying documentation were canards, doctored and forged by Mongillo. Western Surety had no knowledge of them. The closing was suspended.

The following day, the plaintiffs forwarded all relevant information to Western Surety so that the company could decide whether it would issue a valid bond. About ten days later, Western Surety de-

1. The arrangement contemplated that VacEq would continue to sell unit weeks until shortly before the closing, at which time the remaining units would be identified and transferred to VBCLP as part of the overall sale. At the closing, VBCLP was also to take over VacEq's operating account and all deposits held in respect of pending sales.

clined to participate. The closing imploded. Unwilling to wait any longer, VacEq cancelled the purchase agreement.

In August 1984, VBCLP filed suit against Mongillo, EWM Co., Western Surety, and IRM. Faneuil sued the same four defendants plus FRG. Faneuil's complaint charged that Mongillo and EWM Co. misrepresented their authority to deliver the bond; that the defendants, jointly and severally, breached their contract to provide an authorized bond; that Faneuil relied to its detriment on the apparent authority of Mongillo and the EWM Co. to issue bonds on Western Surety's behalf, as well as on the defendants' representations that they would furnish a valid bond; that Western Surety was negligent in licensing Mongillo and supervising his activities; and that all defendants engaged in acts and practices violative of Mass.Gen.L. ch. 93A. The district court consolidated the two cases for all purposes and realigned FRG as a party plaintiff.[2] The parties stipulated to have a magistrate judge preside at trial. *See* 28 U.S.C. § 636(c).

Trial began in September 1989 and lasted for almost three weeks. At the end of plaintiffs' case, the court directed a verdict in favor of EWM Co. At the close of all the evidence, the court said that it would submit special questions to the jury, accompanied by two verdict forms: one to be employed if the jury found exclusively in the defendants' favor (Verdict Slip No. 1) and the other to be employed if the jury found for either or both of the plaintiffs (Verdict Slip No. 2). No one objected to this procedure and it was followed. The ensuing rigamarole became the focus of considerable controversy, *see infra* Part VI, but the bottom line was a verdict for FRG alone, against Mongillo alone, in the sum of $2,300,000. The Chapter 93A proceedings were then completed and a slew of post-trial motions were denied.

There are a salmagundi of issues presented on appeal. To put them in better perspective, we attach as an appendix the special questions, the jury's responses, and the verdict slip as completed by the jury. We discuss many of the issues but leave others untouched, believing the latter group to be patently meritless.

## II. EXCLUSION OF FANEUIL'S NEGLIGENT ENTRUSTMENT CLAIM

Faneuil argues that the lower court erred in dismissing a claim, mistakenly denominated by Faneuil in its brief as one for negligent misrepresentation, which charged Western Surety with carelessness in licensing and monitoring Mongillo. The court struck the claim before trial pursuant to Fed.R.Civ.P. 16(f), which permits the imposition of sanctions upon parties who fail to comply with, or who endeavor to subvert, pretrial orders. The magistrate found Faneuil to have been derelict in preserving the claim for trial. He stated: "Nothing in the Pretrial Memoranda filed by any of the parties, and nothing in the requests for instructions submitted by any and all of the plaintiffs [in advance of trial], even remotely suggested that plaintiffs contended they were entitled to recover upon a showing of negligent hiring and/or supervision...."

The proper performance of the case-management function requires that the trial court be allowed great latitude in applying Rule 16(f). *Accord Matter of Sanction of Baker*, 744 F.2d 1438, 1440 (10th Cir. 1984) (Rule 16(f) "give[s] courts very broad discretion to use sanctions where necessary ... to insure the expeditious and sound management of the preparation of cases for trial"), *cert. denied*, 471 U.S. 1014, 105 S.Ct. 2016, 85 L.Ed.2d 299 (1985). Thus, we review the magistrate's imposition and choice of sanctions only for abuse of discretion. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976); *Roland M. v. Concord School Comm.*, 910 F.2d 983, 999 (1st Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991).

---

**2.** On realignment, FRG did not file its own complaint but, in effect, adopted Faneuil's complaint. Prior to trial, a default was entered against IRM. During trial, the action brought by VBCLP was dismissed. None of these rulings have been appealed.

■ Faneuil challenges the preclusive order primarily on the basis that the negligent entrustment claim was part of its original complaint. The riposte is misdirected. The issue is not whether the claim was ever raised in the pleadings, but whether it was sufficiently developed and perennialized in the relevant pretrial proceedings. As a case takes shape and the court struggles to narrow and pinpoint the issues, the parties have an unflagging obligation to spell out squarely and distinctly those claims they desire to advance at the trial proper. Good-faith compliance with Civil Rule 16 plays an important role in this process. *See Erff v. MarkHon Industries, Inc.,* 781 F.2d 613, 617 (7th Cir.1986) ("Because the parties rely on the pre-trial conference to inform them precisely what is in controversy, the pre-trial order is treated as superseding the pleadings and establishes the issues to be considered at trial."). In these purlieus, a litigant forsakes clarity and forthrightness at its peril.

Here, the record confirms that Faneuil failed to advance the negligent entrustment theory in any of its pretrial submissions. To be sure, Faneuil stated in its pretrial memorandum that it would prove the laxity of Western Surety's supervision—but the sole theory of liability to which that proffer related was premised on agency grounds, viz., "that Western Surety was bound by and responsible for the actions of its licensed agent, Robert F. Mongillo, and was bound to honor the Bond that its agent had issued, or be liable for all damages sustained as a result of Mr. Mongillo's issuance of an unauthorized Bond." There was no mention of negligent entrustment or any comparable theory. We agree with the magistrate that a single reference to negligent entrustment in a lengthy complaint, casually made and soon forgotten, was not enough. When all is said and done, veiled hints and cryptic allusions will not suffice to preserve claims for trial.

In sum, the fair intendment of Faneuil's filings, taken sequentially, conduced to the belief that, as trial neared, negligent entrustment was no longer in the case. Hence, the court could properly find that Rule 16 was flouted and that Western Surety would be unfairly prejudiced if Faneuil's failure appropriately to preserve the issue was overlooked. We conclude, therefore, that dismissing the negligent entrustment claim did not entail an abuse of discretion. *See Erff,* 781 F.2d at 618 (trial court was not obligated to consider plaintiff's alternative theory of recovery because it was not disclosed at pretrial conference); *Allen v. United States Steel Corp.,* 665 F.2d 689, 696 (5th Cir.1982) (same); *see also Roland M.,* 910 F.2d at 999 ("When a litigant tardily seeks to bring a new issue in from the cold, the reasons for changing the syllabus and whether prejudice may result are factors which inform the district court's discretion.").

## III. SUNDRY EVIDENTIARY RULINGS

We turn next to an assortment of evidentiary rulings protested, variously, by one party or another.

### A. *The Plea Colloquy and Criminal Conviction.*

■ During the trial, the court accepted in evidence, over objection, the plea colloquy and criminal conviction of one "Robert F. Mongillo" for certain acts of mail and wire fraud. On appeal, Mongillo argues that the court erred in admitting the evidence because there was no sufficient foundation linking him to the "Robert F. Mongillo" who was involved in the criminal prosecution. The argument beggars credulity.

■ Conceptually, this challenge is governed by Fed.R.Evid. 104(b).[3] It is beyond dispute that "[t]rial judges have wide discretion in deciding whether an adequate foundation has been laid for the admission of evidence." *Real v. Hogan,* 828 F.2d 58, 64 (1st Cir.1987). The Supreme Court has

---

**3.** The Rule provides:

When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition. Fed.R.Evid. 104(b).

clearly articulated the process by which a trial court should examine the soundness of an evidentiary foundation:

> In determining whether the [plaintiff] has introduced sufficient evidence to meet Rule 104(b), the trial court neither weighs credibility nor makes a finding that the [plaintiff] has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact ... by a preponderance of the evidence.

*Huddleston v. United States,* 485 U.S. 681, 690, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988); *see also Onujiogu v. United States,* 817 F.2d 3, 5 (1st Cir.1987).

In this case, a more than sufficient foundation was set in place. Prior to reading the plea colloquy into evidence, the plaintiffs presented portions of Mongillo's deposition. These extracts established that the Robert F. Mongillo sued herein was born on April 16, 1936; graduated from Boston College in 1958; and participated in a transaction involving Faneuil and the Veranda Beach resort circa 1983–1984. The identically named criminal defendant admitted in the plea colloquy to being 49 years old in January 1986, a 1958 graduate of Boston College, and a participant in a deal involving Faneuil and Veranda Beach during the 1983–1984 time frame. Given such strong identifying evidence, the contention that there was an insufficient foundation connecting one Mongillo to the other can only be described as an exercise in casuistry. The law is not so struthious as to compel a factfinder to ignore that which is perfectly obvious. *See United States v. Ingraham,* 832 F.2d 229, 240 (1st Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

■ Mongillo also urges that the evidence's probative value was overwhelmed by its unduly prejudicial effect. *See* Fed.R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...."). He asserts that the plaintiffs adduced enough evidence inde-

pendent of his criminal conviction to show that he had committed fraud, thus rendering the introduction of his criminal conviction gratuitously excessive. We are unimpressed. While it is true that the plaintiffs offered other evidence indicating that Mongillo engaged in fraudulent acts, we do not find the admission of the conviction to be so unfairly cumulative as to require reversal. Rather, this evidence served to confirm what the other evidence merely suggested: that Mongillo in fact orchestrated the very scheme for which the plaintiffs were seeking money damages.

■ In any event, trials were never meant to be antiseptic affairs; it is only unfair prejudice, not prejudice per se, against which Rule 403 guards. *See Onujiogu,* 817 F.2d at 6. And the trial court's construction of the probative value/unfair prejudice balance, hammered out during the rough and tumble of the trial itself, is subject to substantial deference on appeal. *See United States v. Hadfield,* 918 F.2d 987, 994 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991); *see also Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1340 (1st Cir. 1988) (a trial court's application of Evidence Rule 403 should be disturbed only in "extraordinarily compelling circumstances"). There was no unfair prejudice or misuse of the trier's discretion in this instance.

### B. *The License Suspension.*

■ On the issue of whether EWM Co. had reason to suspect that Mongillo might exceed his express authority as an agent, the magistrate permitted evidence that Mongillo's license had been suspended by the Connecticut Division of Insurance for sixty days in 1979. Over the plaintiffs' objections, however, he excluded many of the particulars of the event, e.g., facts showing that the 1979 suspension arose out of an incident in which Mongillo tried to deliver a forged bond. The court allowed evidence that EWM knew of the suspension, but refused to allow evidence that the firm paid a portion of the administrative fine. FRG contends that the excluded evi-

dence should have been admitted under Evidence Rule 404(b) to show that EWM had ratified a forgery in the past, thus suggesting either an agency relationship in respect to the Western Surety bond or a likelihood that EWM Co. would ratify the Veranda Beach transaction.

■ Determining the admissibility of evidence under Rule 404(b) engages a two step analysis.[4] First, the trial court must ascertain whether the evidence has a "special relevance" in that it is offered not to show a defendant's evil inclination but rather to establish some material fact. *See Hadfield*, 918 F.2d at 994; *United States v. Devin*, 918 F.2d 280, 286 (1st Cir.1990). If the trial court finds sufficient relevance, the next step requires that it gauge probative weight against prejudicial effect pursuant to Fed.R.Evid. 403. *See, e.g., Devin*, 918 F.2d at 286. "If the evidence brings unwanted baggage, say, unfair prejudice or a cognizable risk of confusing the jury, and if the baggage's weight substantially overbalances any probative value, then the evidence must be excluded." *United States v. Rodriguez–Estrada*, 877 F.2d 153, 155 (1st Cir.1989).

The lower court excluded the proffered facts on the ground that they were unduly cumulative and, therefore, failed to satisfy the second prong of the test. Its statements also suggested, however, that the evidence lacked the necessary relevance to satisfy the first prong. Either way, we believe that the rulings were within the ambit of the trier's sound discretion. Given what had already been admitted, the facts in question would not have helped in any significant measure to establish the existence of an agency relationship in 1983–1984.

For example, to establish apparent authority, the plaintiffs had to show that EWM did something that caused them to believe that Mongillo was its authorized agent. *See Sheinkopf v. Stone*, 927 F.2d 1259, 1269 (1st Cir.1991). This evidence would not have helped. There was no proof that, at the time the plaintiffs dealt with Mongillo, they knew of EWM's purported "ratification" of Mongillo's prior malfeasance. There was likewise no proof that plaintiffs relied on any such show of support to conclude that the firm would stand behind Mongillo in the Veranda Beach matter, come what might. Nothing in the excluded evidence would have filled these gaps.

■ By the same token, to establish vicarious liability, it had to be shown that, with respect to the transaction in question, Mongillo was acting within the scope of his employment, meaning under Massachusetts law that he was motivated, at least in part, by a goal of serving his employer's interests. *See Wang Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 501 N.E.2d 1163, 1166 (1986). The excluded evidence provided no insight into any motivation on Mongillo's part to benefit EWM through the Veranda Beach deal; indeed, nothing in the excluded facts indicated that Mongillo, when he misbehaved in the 1970s, did so with the intention of enriching EWM.

■ In the federal system, a trial court has appreciable flexibility in admitting or excluding evidence on relevancy grounds. *See United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir.1989); *Freeman*, 865 F.2d at 1339. Under the circumstances of this case, the court's decision not to allow evidence of the subsidiary facts underlying the 1979 suspension cannot be faulted.

C. *The Requests for Admission.*

■ In the course of discovery, FRG propounded requests for admission of facts under Fed.R.Civ.P. 36(a). Responding on behalf of EWM Co. (of which he was an officer and part-owner), Mongillo refused to answer a number of the requests, invoking his fifth amendment privilege against

---

**4.** The Rule provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

self-incrimination. At trial, FRG sought to have those requests, and Mongillo's responses, read to the jury so that the talesmen might draw an adverse inference *against the corporation.* The court ruled that the requests and responses could not be read because they were cumulative; the information sought through the requests had already been conclusively established in other ways. FRG argues that the court erred in excluding this evidence because, wholly apart from the information the requests sought to elicit, the mere fact that Mongillo was designated to answer the questions was relevant to prove the agency relationship between Mongillo and EWM and to establish the adverse inference.

These arguments are disingenuous. A review of the requests reveals that those in question dealt with Mongillo's role in the Veranda Beach transaction, not the relationship between Mongillo and EWM or the business of EWM Co. per se.[5] In other words, no one but Mongillo could usefully have responded. FRG's attempt to contrive some indicia of a far-flung agency relationship out of the fact that Mongillo was designated to address inquiries that were unanswerable by any other officer of the corporation is palpably unconvincing.

To be sure, when requests to admit are served on a corporate party, Fed.R.Civ.P. 36(a) does not expressly require them to be answered by the most knowledgeable person available. The rule does require, however, that the respondent make "reasonable inquiry" into the subject matter of the requests. *See* 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2261 (1970) ("a party may not give lack of information or knowledge as a reason for failing to admit or deny unless he states that he has made reasonable inquiry and that the information known or readily obtainable by him is insufficient to enable him to admit or deny"). Here, Mongillo was the only officer of the corporation who could conceivably respond to these requests. Whether EWM Co. asked him to address them directly or to answer them indirectly by reacting informally to the "reasonable inquiry" of some other corporate officer seems to us a distinction without a difference.

█ There is also a second fallacy in FRG's argument. An individual's invocation of his fifth amendment privilege against self-incrimination is a personal decision. It cannot be imputed to a corporation. "Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation." *United States v. White,* 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944). In a civil case, therefore, an individual's invocation of a personal privilege against self-incrimination cannot, without more, be held against his corporate employer in circumstances analogous to those at the bar. Thus, FRG's contention that Mongillo's exercise of his fifth amendment right should be interpreted adversely to EWM is unsupportable.[6]

---

**5.** We offer a representative sampling. The disputed requests asked EWM Co. to admit *inter alia* that:

> 17. Robert Mongillo represented to Faneuil that in matters relating to the financial guaranty bond at issue in this lawsuit he was acting with the express authority of Western.

> . . . . .

> 25. During February–April, 1984, Robert Mongillo requested certain information from Faneuil relating to the financial guaranty bond at issue in this litigation, represented to Faneuil that he obtained such information on behalf of Western and that Mr. Mongillo would forward said information.

> . . . . .

> 32. At no time before the meeting on April 25, 1984 ... did Robert Mongillo inform Faneuil, F.R.G., Veranda Beach Club Limited

Partnership or Union Trust that Western bond # 69043811 was not valid.

**6.** We do not address here the propriety of a corporate officer's use of a personal right when answering requests for admission on behalf of a corporation. *Cf. United States v. Kordel,* 397 U.S. 1, 8, 90 S.Ct. 763, 76, 25 L.Ed.2d 1 (1970) (in the context of interrogatories to a corporation under Fed.R.Civ.P. 33, the corporation cannot appoint an agent who will invoke his fifth amendment right, for to do so "would effectively permit the corporation to assert on its own behalf the personal privilege of its individual agents"). That question could have been raised below by a motion to strike or to compel further answers to the requests. *See id.* at 9, 90 S.Ct. at 768. FRG did not file such a motion. Hence, the question is not before us.

We have said enough. As a general proposition, we review rulings excluding evidence in civil cases by reference to an abuse-of-discretion benchmark. *See, e.g., Knowlton v. Deseret Medical, Inc.*, 930 F.2d 116, 124 (1st Cir.1991); *Freeman*, 865 F.2d at 1339. In these circumstances, we discern no abuse.

## IV. THE DIRECTED VERDICT IN FAVOR OF EWM CO.

Plaintiffs complain that the lower court erred in directing a verdict in favor of EWM Co. They contend that sufficient evidence was presented to warrant a finding that the firm was vicariously liable for Mongillo's fraud or, alternatively, that the firm had authorized him to contract with FRG on its behalf. Under the accepted standard of appellate review, we "examine the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the nonmovant" to determine whether "reasonable persons could reach but one conclusion." *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir.1987). If so, and if that exclusive conclusion favors the movant, then the instructed verdict may stand. *Id.* While a court faced with such a motion may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence, "a mere scintilla of evidence is not enough to forestall a directed verdict, especially on a claim or issue as to which the burden of proof belongs to the objecting party." *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1088 (1st Cir. 1989); *see also Vahlsing v. Commercial Union Ins. Co.*, 928 F.2d 486, 490 (1st Cir.1991) (reviewing court must refrain from conjecture or speculation).

### A. *The Facts.*

Viewed through such a glass, the proof in this case showed that Mongillo was an agent for Western Surety, both individually and through EWM. He began to work for EWM, a family-owned enterprise, in 1960. He served as president of the firm for an unspecified period ending in 1981 or 1982, when his wife, Patricia, succeeded him. Thereafter, he served as treasurer and a director until the late 1983. Throughout, he owned stock in the firm. Mongillo maintained his only business office at EWM's headquarters in New Haven, Connecticut.

In 1983, Mongillo established IRM, a Delaware corporation. No person other than Mongillo had any interest in IRM. Its business address was a postal drop. It had no listed telephone number. It was not licensed by any state as an insurance agent or broker. It had no employees. It had no discernible links with either EWM or Western Surety.[7] IRM, in short, was Mongillo's paper tiger—a straw corporation. In contrast, EWM was a thriving concern with an independent identity. It had stockholders, directors, officers, and employees. It was a licensed agent for a number of insurance companies, including Western Surety.

In early 1984, Eller sent an assortment of sample bond forms and background materials on Veranda Beach to Mongillo at EWM's offices. At the end of January, Mongillo sent Faneuil a letter, written on EWM stationery, which stated that IRM had made arrangements for Western Surety to issue a bond. He enclosed a copy of what purported to be a commitment letter from Western Surety, written on its letterhead and ostensibly signed by an officer. The commitment letter confirmed that Western Surety would provide the bond if a number of conditions were met. This letter was completely bogus; it was written by Mongillo and the signature was forged by him.[8]

---

7. Ironically enough, in the corporate filings made by IRM with the state of Delaware, Eller was listed as IRM's president. Similarly, Elio and his wife were named as directors. Eller and Elio emphatically denied having accepted these offices, authorized the listing, or known of Mongillo's ultracrepidarian use of their names in this respect.

8. Some time previously, Western Surety had furnished EWM with a kit containing blank bonds, powers of attorney, and indemnity agreements. Mongillo had access to these materials. He used them in fashioning the ersatz documentation.

The negotiations which followed were based on the representations contained in the apocryphal commitment letter. The parties understood all along that IRM would collect both the bond premium and the service fee at the closing. Arrangements were in place to wire-transfer these sums immediately to IRM's bank account in Delaware. Neither Western Surety nor EWM Co. would have seen a dime.

## B. *Vicarious Liability.*

It is settled law in Massachusetts that an employer may be held vicariously liable for an intentional tort committed by an agent or employee within the scope of the employment. *Worcester Ins. Co. v. Fells Acres Day School, Inc.,* 408 Mass. 393, 558 N.E.2d 958, 967 (1990). The Massachusetts Supreme Judicial Court (SJC) has established a tripartite test for determining scope-of-employment questions:

> [C]onduct of an agent is within the scope of employment if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer.

*Wang Laboratories,* 501 N.E.2d at 1166 (citations omitted). It is beyond cavil that selling bonds is the kind of work Mongillo was employed by EWM Co. to do. It is also reasonably clear that Mongillo concocted the hoax from his New Haven office during normal working hours. The issue on vicarious liability, therefore, reduces to what evidence, if any, was adduced that would found the conclusion that Mongillo had an intention of serving his employer, EWM Co., when he perpetrated the fraud.

Having ransacked the record, we agree with the magistrate that no such evidence was presented. The correspondence between Mongillo and Faneuil made clear that IRM was the intermediary of record. From aught that appears, Mongillo acted solely to benefit himself, using IRM as a conduit. He took great pains to alert the other participants that IRM, not EWM, would be responsible for orchestrating the

transaction. Even the letter written on EWM's stationery indicated in its opening sentence that it was sent on behalf of IRM. IRM, not EWM, was to receive not only the servicing fee, but the bond premium. The evidence, we think, would not allow a rational juror to reach any conclusion other than that Mongillo and his alter ego, IRM, were intended to be the exclusive beneficiaries of the fraud.

Plaintiffs' counterattack is on both factual and legal fronts. On the facts, they point to Mongillo's deposition, where he stated that he ventured upon this scheme in order to secure more lucrative business opportunities for the future. Because some of this new business would probably inure to EWM Co., plaintiffs hypothesize, it can be inferred that Mongillo intended to serve the firm when he practiced the fraud. We find this reasoning anfractuous. The logical import of the cited testimony is that Mongillo's long-term goal was to solidify the working relationship between Faneuil and his alter ego, IRM. Why else, one might ask, would Mongillo have falsified so elaborate an imbrication, *see supra* note 7, between IRM and Faneuil's top executives? There is not so much as a hint of an intimation that Mongillo intended to enrich EWM's coffers.

The plaintiffs' legal argument has more substance. Citing *New England Acceptance Corp. v. American Mfrs. Mut. Ins. Co.,* 4 Mass.App.Ct. 172, 344 N.E.2d 208 (1976), *aff'd,* 373 Mass. 594, 368 N.E.2d 1385 (1977), they contend that an agent's intent to benefit the principal is not necessarily an element in determining the scope of his employment. In *New England Acceptance,* certain corrupt agents of the defendant insurers sold promissory notes secured by nonexistent policies, purportedly written by the agents on behalf of the defendants, to a premium financing agency. When the fraud was discovered, the financier sued. Although the facts established that the agents had acted solely for their own benefit, the Appeals Court upheld a judgment for the plaintiff:

> Having put the [agents] in a position to commit the fraud while apparently acting for the companies, the companies are lia-

ble to the plaintiff for the losses sustained thereby. Such liability attaches without regard to whether the companies received any benefit from the transactions and regardless of the fact that the [agents] were acting entirely for their own purposes in selling the fraudulent notes.

344 N.E.2d at 214.

From our coign of vantage, the chief problem with *New England Acceptance* is that it is a decision of an intermediate appellate court antedating by roughly a decade the SJC's definitive formulation of the vicarious liability standard in *Wang Laboratories,* 501 N.E.2d 1163. A federal court of appeals is "bound ... by the actual expression of the state's highest court" on points of state law. *Jackson v. Liquid Carbonic Corp.,* 863 F.2d 111, 115–16 (1st Cir.1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989); *see also Commissioner of Internal Revenue v. Bosch's Estate,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967) (a "State's highest court is the best authority on its own law"). Hence, we cannot honor *New England Acceptance* at the obvious expense of *Wang Laboratories.*

Above and beyond this reality, even if *New England Acceptance* retains some vitality, it is distinguishable from the present case in three salient respects. In *New England Acceptance,* the facts established that the defendants' management was aware of the transaction upon which suit was later premised, *see* 344 N.E.2d at 211; conversely, there is no evidence that anyone affiliated with EWM Co., apart from the tortfeasor himself, knew anything about the Veranda Beach scam. Second, the *New England Acceptance* court noted that the agents appeared to be acting for the defendant insurers, *id.* at 214, whereas the facts here demonstrated an absence of any such apparent authority, *see infra* Part IV(C). Lastly, the *New England Acceptance* court based its decision largely on the "well settled principle[ ] of agency law [that] the authority of an insurance agent to sell insurance, unless limited by his principal, includes authority to do all acts which are incidental thereto...." *Id.* at 212.

But in *New England Acceptance,* unlike here, the employer was the issuer of the instrument in question. Put another way, in *New England Acceptance* the defendants were both the employers of the tortfeasors and the purported issuers of the fictitious policies said to secure the phony notes sold to the plaintiff. In contradistinction, EWM Co., while charged with being Mongillo's employer, was never thought to be the maker of the bogus bond; instead, EWM is itself being sued as, or in the shoes of, the agent-tortfeasor who delivered the bond, not as the principal who purportedly issued it.

Given the tenor of the SJC's opinion in *Wang Laboratories,* the doubtful precedential value of *New England Acceptance,* and the factual incongruences in the cases, we believe that the magistrate was correct in ruling that EWM, as a matter of law, could not be held vicariously liable for Mongillo's cozenage.

### C. Apparent Authority.

Under Massachusetts law, apparent authority is that authority resulting from conduct by the principal which causes a third person reasonably to believe that a particular person has authority to make representations as his agent. *Hudson v. Massachusetts Property Ins. Underwriting Ass'n,* 386 Mass. 450, 436 N.E.2d 155, 159 (1982). The requirement that the principal's conduct must engender a reasonable belief in the agent's authority implicates the theory of agency by estoppel. "If a third person goes on to change his position in reliance on this reasonable belief, the principal is estopped from denying that the agency is authorized." *Id.*

We agree with the court below that there was no evidence sufficient to show that EWM Co. engaged in conduct leading the plaintiffs reasonably to believe that Mongillo possessed, and was exercising, the authority to bind the firm. Rather, the facts admit of only one set of conclusions: Mongillo was acting for himself, through his straw corporation, IRM; the plaintiffs knew it; and they did not care.

Concededly, Mongillo was an officer of EWM at the time of the transaction; he wrote a letter to Eller on EWM's stationery; he used an office, telephone, and secretary provided to him by EWM as a base of operations for his machinations in regard to Veranda Beach; and he cherry-picked a bond kit that Western Surety had entrusted to EWM. Such fragmentary tendrils, however, show much more about Mongillo's conduct than about EWM's conduct. We recently held in *Sheinkopf v. Stone* that a partner's use of his law firm's office, secretary, telephone, and stationery in transacting a real estate deal to his own behoof was not enough to make out a jury question on apparent authority under Massachusetts law. 927 F.2d at 1265–66; *see also Kanavos v. Hancock Bank & Trust Co.,* 14 Mass.App.Ct. 326, 439 N.E.2d 311, 315 (titles or trappings of office in themselves do not supply a basis for finding apparent authority), *rev. denied,* 387 Mass. 1103, 440 N.E.2d 1177 (1982). We believe that, unless we are willing to draw leap-of-faith inferences on the basis of evidence that is, at best, faintly suggestive rather than fairly probative, the same result must obtain here.

Nor was there evidence of any detrimental reliance or change in position which might fairly be laid at EWM's doorstep. All the indicators in the record point unerringly to the fact that the plaintiffs placed their trust and confidence—foolishly, as matters turned out—in Mongillo, without regard to whether EWM was part of the equation. Lobbying for an opposite finding, the plaintiffs spotlight Eller's testimony that, because Mongillo, acting on behalf of EWM Co., had written insurance in the past for Carmen Elio (Faneuil's president), Eller assumed that Mongillo was working on behalf of EWM in arranging for the bond. But Eller did not say, and the record would not permit an illation, that it made any difference to Faneuil or FRG whether Mongillo was free-lancing, or representing EWM, or representing IRM, or fronting for Beelzebub. At any rate, Eller's conjectural testimony cannot overcome the uncontradicted evidence that, *in connection with the deal in question,* Mongillo made it clear that he was acting on behalf of his own corporation, IRM, and not on behalf of EWM Co. There was no basis for *reasonable* reliance to the contrary.

In the final analysis, liability must rest on proof, not mere suspicion. Thus, the trial court was under no obligation to draw unreasonably speculative inferences or to see mountains where only molehills existed. *See Yerardi's, etc., Inc. v. Board of Selectmen,* 932 F.2d 89, 93–94 (1st Cir. 1991); *Santiago–Negron v. Castro–Davila,* 865 F.2d 431, 445 (1st Cir.1989). Because the attempts to link EWM to Mongillo's hoax, though valiant, relied principally on tenuous insinuation, they were impuissant to take the issues of vicarious liability and apparent authority to the jury.

## V. FANEUIL'S CLAIMS OF INSTRUCTIONAL ERROR

The magistrate charged the jury that it had to find Faneuil and FRG were joint venturers in order for Faneuil to recover against any defendant. Absent some such arrangement, he reasoned, the jury could only view Faneuil as FRG's internuncio. In that capacity, Faneuil was not entitled to recover for any wrongs committed against FRG. It is, after all, black letter law that when an agent contracts with third persons on behalf of a disclosed principal, the contractual obligations and benefits do not inure to the agent's behoof. *See, e.g., Columbia Broadcasting System, Inc. v. Stokely–Van Camp, Inc.,* 522 F.2d 369, 375 (2d Cir.1975); *Gearing v. Berkson,* 223 Mass. 257, 111 N.E. 785, 786 (1916); 3 Am.Jur.2d, *Agency* § 314 (1986). Faneuil claims that this instruction was wrong because, regardless of its status as a joint venturer *vel non,* the jury still could have found in its favor on tort or promissory estoppel theories.

### A. *Factual Precis.*

We pause to rehearse certain facts. Sometime in 1983, FRG hired Faneuil to procure financing for the Veranda Beach acquisition. Faneuil was paid $5,000 per month for its services. These payments were discontinued as of February 1984.

From then on, the parties' relationship was governed by a written agreement dated April 16, 1984 (the Agreement). Under the Agreement, Faneuil was to provide services as originally contemplated. Its reward for those services was clearly delineated in the Agreement:

> Faneuil agrees to become a Limited Partner in the Partnership and, in addition to the services described hereinabove, shall use its best efforts to arrange for the financing needs of the Partnership of all kinds.... Prior to syndication, Faneuil's interest shall be equal to forty-five percent (45%) of the operating profits and losses and cash flow distributions from the Partnership.

Faneuil was to receive the above-described interest in lieu of any other remuneration. Moreover, to obtain its share of profits and cash flow, Faneuil was not obliged to contribute any capital or bear any of the financial risks associated with the partnership's operations.

Expert testimony at trial indicated that, had the closing been completed as planned, the property acquired would have been worth much more than the purchase price; FRG's equity, the expert said, would have equalled $2,300,000. The only testimony offered on the likelihood of partnership profits suggested that significant carrying costs and operating expenses over the first few years would probably cause the venture to run at a loss.

### B. *Recovery in Tort.*

The jury found that Faneuil and FRG were not joint venturers; that Mongillo did not recognize Faneuil as a principal in the transaction; and that he never intended Faneuil to be a beneficiary of his promise to obtain a bond. *See* Appendix. Faneuil claims that, despite these findings, the evidence was sufficient to allow it to recover for either negligent or intentional misrepresentation. We think not.

■ 1. *Negligent Misrepresentation.* Faneuil's main thesis prescinds from a line of Massachusetts cases holding that a third party may sometimes recover against a defendant who negligently performs servic-

es for another person. *See Rae v. Air–Speed, Inc.*, 386 Mass. 187, 435 N.E.2d 628, 632 (1982); *Craig v. Everett M. Brooks Co.*, 351 Mass. 497, 222 N.E.2d 752, 755 (1967). To invoke the doctrine, the third party must show that the promisor knew that the third party was relying on the prospect that the services would be properly executed. *See Page v. Frazier*, 388 Mass. 55, 445 N.E.2d 148, 154 (1983); *Craig*, 222 N.E.2d at 755. Here, the jury specifically found that Mongillo never viewed Faneuil as an intended beneficiary of his promise. In other words, the actor had no reason to know of Faneuil's independent reliance on his promise to perform. Ergo, an indispensable element of the putative cause of action was missing.

Moreover, the jury's finding was amply supported. The evidence makes clear that Faneuil was hired by FRG to arrange the deal on its behalf, and that Faneuil interacted with Mongillo in that agentival capacity. Of course, Eller testified that he told Mongillo of Faneuil's plan to become a limited partner—but the jury was under no obligation to believe this quintessentially self-serving statement. Even crediting it, the jury could reasonably have concluded, nevertheless, that Faneuil was primarily a hired consultant with an out-of-the-ordinary compensation arrangement who facilitated a contract between FRG and Mongillo—not a principal. After all, a lawyer who accepts an engagement on a contingent fee basis under which he will share in the anticipated pot of gold at rainbow's end is still his client's agent, not his copartner in a legal sense. *Cf. Deshotels v. United States*, 450 F.2d 961, 966 (5th Cir.1972) ("The contingent fee 'coupled with an interest' is ... language indicative of a special agency relationship and not a transfer of a present possessory interest.") (construing Louisiana law).

Whether or not contractual privity was an element of Faneuil's claim, it is apparent that Mongillo had no cogent reason to view Faneuil as a beneficiary of his promise. It is equally apparent that, unlike in *Craig*, 222 N.E.2d at 755, the services which Faneuil was hired to perform did not neces-

sarily depend for their successful execution on Mongillo's fulfillment of his obligation; Faneuil was free to find the financial guaranty wherever it chose. Under the totality of the demonstrated circumstances, we discern no error in the rejection of this claim.

■ 2. *Intentional Misrepresentation.* Faneuil's fallback position is that it could have recovered under a theory of intentional misrepresentation. Yet, one element of this cause of action requires the plaintiff to show that defendant induced it to act, or to refrain from acting, to its detriment. *See Graphic Arts Finishers, Inc. v. Boston Redevelopment Authority,* 357 Mass. 40, 255 N.E.2d 793, 796 (1970). Faneuil did not carry its burden in this regard. For one thing, the jury found that Mongillo made no promises to Faneuil; hence, Faneuil cannot plausibly claim to have been intentionally induced. For another thing, Faneuil did not offer any evidence indicating detrimental reliance; there is simply no suggestion of opportunities forgone by Faneuil in order to continue its negotiations with Mongillo.

■ 3. *No Proof of Damages.* Faneuil's tort theories are also deficient in another respect. Faneuil was to become a limited partner upon successful completion of the closing. Its interest would equal "45% of the operating profits and ... cash flow distributions from the Partnership." But, no evidence was introduced regarding either the profits that the partnership might have been expected to reap or the cash that might have been distributed. Indeed, Faneuil presented no economic evidence at all. Expert testimony adduced by FRG established that acquisition of the Veranda Beach property would have conferred an equity bonanza on FRG, but showed nothing about the impact of the transaction on Faneuil (a non-equity participant). What is more, the testimony was

unequivocal that a profit-and-loss interest is wholly distinct from an equity interest.

We think that the upshot is clear. Economic damages must be based on hard evidence, not on cotton candy composed of conjecture, speculation, and surmise. Here, Faneuil failed to demonstrate that it suffered any recoverable damages. The resultant lacuna was fatal to its claim. Proof of damage is, of course, an essential element of a plaintiff's case in tort. *See, e.g., Powers v. Boston Cooper Corp.,* 926 F.2d 109, 111 (1st Cir.1991) (sustaining dismissal of claim for fraud and misrepresentation under Massachusetts law where plaintiff failed to show that "some cognizable harm flowed from the defendant's conduct"); *Szpiro v. Corkin,* 340 Mass. 260, 163 N.E.2d 283, 284 (1960) (per curiam) (similar); *see also Poulin Corp. v. Chrysler Corp.,* 861 F.2d 5, 7 (1st Cir.1988).

*C. Promissory Estoppel.*

■ Faneuil's remaining theory of recovery is equally unavailing. Under the doctrine of promissory estoppel:

'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'

*McAndrew v. School Committee of Cambridge,* 20 Mass.App.Ct. 356, 480 N.E.2d 327, 332 (1985) (quoting Restatement (Second) of Contracts § 90(1) (1981)). Charting the contours of the doctrine reveals quite plainly that Faneuil's reliance on it fails for essentially the same reasons discussed in Part V(B), *supra.*[9] On this record, the jury's finding that Mongillo did not expect Faneuil to rely on his promise was sustainable; and in any event, there was no proof either that Faneuil forewent any other op-

---

**9.** We realize this assignment of error is postured differently than the assignments discussed earlier. On this issue, Faneuil contends that (1) the court erred in its instructions on promissory estoppel because it did not mention that a third party, not just a promisee, might potentially recover; and (2) the special questions given to the jury only allowed the jury to consider this doctrine if it found that no contract existed between Mongillo, on the one hand, and FRG *or* Faneuil, on the second hand. Our view of the infirmity of Faneuil's underlying position, however, renders superfluous any detailed analysis of the context in which Faneuil's arguments are advanced.

portunities in order to pursue Mongillo's proposal, or that it suffered any damages in reliance on his misrepresentations.[10]

## VI. RESUBMISSION TO THE JURY

■ We set the stage. When the jury first returned, it indicated, in answering Question No. 3, that Mongillo acted with Western Surety's apparent authority; yet it rendered a verdict against Mongillo alone.[11] FRG urged the court to enter judgment against Western Surety on the basis of the jury's answers to the special questions. The court rejected this suggestion, instead bringing the jury into the courtroom and explaining that there was an inconsistency between the verdict and the answers. The jury resumed deliberations, armed with pristine replicas of the special questions and verdict slips. After approximately fifteen minutes, the jury again returned. Its answers to all the special questions were identical, with one exception. The exception—answering Questions No. 3 and 4a in the negative, rather than in the affirmative—remedied the inconsistency. The jury again rendered a verdict in favor of FRG alone, against Mongillo alone, in the amount of $2,300,000.

Fed.R.Civ.P. 49(b) supplies the mechanism whereby a trial court can ask a jury not only to return a general verdict, but also to answer "written interrogatories upon one or more issues of fact the decision of which is necessary to [the] verdict." *Id.* If the jury returns an inconsistent work product, then:

> When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered ... in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial.

Fed.R.Civ.P. 49(b). In this case, FRG asserts that the trial court erred in selecting the second option and resubmitting the matter to the jury. The assertion rests on three separate pillars. All are wobbly.

FRG first contends that the jury's original answer to the apparent authority queries was not inconsistent with the general verdict (which found in favor of FRG against Mongillo). Because an *explicit* verdict for or against Western Surety was not returned originally by the jury, FRG urges us to rule that the magistrate should have seized upon the first Rule 49(b) option, discharged the jury at that point, and resolved the fate of Western Surety in line with the answers alone.

■ FRG's point is little more than semantic gamesmanship, rooted in a faulty premise. The verdict form is part of the Appendix. It provided two individual spaces for the jury to list which defendants it found liable. The court told the jury: "[F]or the defendants, you may find ... one or both. If you find just against [one], you cross off the other." When it first returned, the jury named Mongillo alone as the party against whom the damage award would run. We think it is perfectly clear that, by inserting Mongillo's name in one space on the verdict form and drawing a line through the other, the jury found in favor of Western Surety. To cite the maxim: expressio unius est excludio alterius. Moreover, if there was room for doubt, we believe that the trial court should be granted substantial latitude in determining whether or not the jury's response to a verdict form which the court prepared is clear and free from ambiguity. *See Richard v. Firestone Tire & Rubber Co.,* 853 F.2d 1258, 1260 (5th Cir.1988) (discussing trial court's leeway in deciding whether jury's answers to special questions are inconsistent), *cert. denied,* 488 U.S. 1042, 109 S.Ct. 868, 102 L.Ed.2d 992 (1989). Thus,

---

10. Damages are, of course, an essential element of a claim for promissory estoppel under Massachusetts law. *See Hall v. Horizon House Microwave, Inc.,* 24 Mass.App.Ct. 84, 506 N.E.2d 178, 184 (1987); *cf. Manganaro Bros., Inc. v. Gevyn Constr. Corp.,* 610 F.2d 23, 24 (1st Cir.1979) (same; breach of contract).

11. In point of fact, the jury's original answer to Question No. 3 was replicated in its answer to Question No. 4a. *See* Appendix. These two answers were synchronized throughout. Thus, when No. 3 was subsequently revised, *see infra,* No. 4a was changed to match.

we uphold the magistrate's ruling that the general verdict was inconsistent with the special answers regarding the existence of apparent authority.

■ In light of this conflict, and in pursuance of Rule 49(b), the court had its choice from among a trio of alternatives. The trier's discretion as to which procedural route should be traversed is not unbridled, but it is deserving of considerable respect on appeal. *See Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1423 (10th Cir.), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986); *Phillips Chemical Co. v. Hulbert*, 301 F.2d 747, 751 (5th Cir.1962). Moreover, a trial court's exercise of its discretion in selecting a course of procedure from among the three options listed in Rule 49(b) must be judged on the entirety of the circumstances which obtained when the perceived inconsistency arose. *Phillips*, 301 F.2d at 751.

In this instance, the court convincingly explained the reasons for resubmitting the matter to the jury in its post-trial memorandum.[12] Under the circumstances, to argue that the magistrate abused his discretion or coerced the jurors by outlining the problem and asking them to deliberate further is to engage in pettifoggery. *See, e.g., Richard*, 853 F.2d at 1259–61 (discussing breadth of trial judge's discretion upon finding of inconsistency).

■ FRG's second argument boils down to the notion that the magistrate mishandled the matter because, in reinstructing the jury that a finding of apparent authority required a general verdict against Western Surety, he improperly suggested that the jury was free to ignore the law and tailor its factual findings to suit its own ideas of justice. To bolster this argument, FRG cites several cases in which appellate courts disapproved of a trial court's interjection of a supplemental instruction which delineated the consequences of the jury's original findings. *See, e.g., Perricone v. Kansas City Ry. Co.*, 704 F.2d 1376, 1378–79 (5th Cir.1983); *Chicago, Rock Island & Pacific Ry. Co. v. Speth*, 404 F.2d 291, 295 (8th Cir.1968); *Phillips*, 301 F.2d at 750–51. The common teaching of these cases is that

> a jury must be totally immune from any possible coercion or subtle pressures to increase or decrease [or change] its decided verdict by reason of the court's interrogation and direction to reconsider its findings.

*Speth*, 404 F.2d at 295.

We find these cases unhelpful. In each of them, the appellate court took exception to the trial court's *supplemental* instruction on the meaning of the verdict; that is, in each of them, the jury was returned to the jury room for further deliberations after receiving *new* information. *See Perricone*, 704 F.2d at 1378; *Speth*, 404 F.2d at 293–94; *Phillips*, 301 F.2d at 750–51. In the case at bar, the jury was not told anything of substance that had not already been elucidated in the original charge. To the contrary, the magistrate had told the jury all along that a finding of apparent authority would render Western Surety liable. His reiteration of this instruction after the inconsistency emerged was, in our view, well within the scope of his discretion. It strains the reality of human experience to read into this carefully worded reinstruction an implicit dispensation to disregard those facts that did not mesh with the jury's notion of a just result.

FRG's last argument is a subset of the preceding argument. FRG contends that the jury's abrupt change in its findings anent apparent authority demonstrates that it disregarded the law in order to accomplish its desired result. To support this contention, FRG relies on *Riley v. K Mart Corp.*, 864 F.2d 1049 (3d Cir.1988).

---

12. FRG makes much of the magistrate's statements, prior to resubmission, indicating his belief that he had no recourse under Rule 49(b) other than to order resubmission. In this case, we do not see how such a mistaken belief can sink to the level of reversible error. The magis- trate clearly had the option of resubmission and, in his post-trial memorandum, belatedly aware that other options also existed, found supportably that resubmission was the "clearly appropriate" course.

We think that *Riley* is a horse of a vastly different hue.

In *Riley,* a slip-and-fall case, the jury initially found in answer to special questions that plaintiff was 70% negligent, defendant was 30% negligent, and plaintiff suffered $250,000 in damages. Because the applicable law did not allow plaintiffs who were more than 50% negligent to recover, the court explained that to the jurors and asked them to clarify the inconsistency between their negligence findings and their damage award. The jury then found plaintiff 49.9% negligent and fixed his damages at $150,000. The Third Circuit reversed the district court's acceptance of the second verdict, ruling that there was little question but that the jury impermissibly tailored its findings to support the desired end result. The panel wrote:

> While a court will not ordinarily inquire into a jury's thought processes, where it becomes obvious that a jury has disregarded the duties assigned it to the extent that its factual findings are but a means to a result a court need not blind itself to that all too apparent reality.

*Id.* at 1054.

The case at hand lacks the trappings of transparent contrivance that festooned the *Riley* case. Here, the jury's original work product contained a single, direct inconsistency, which it resolved in a forthright manner, devoid of fancy footwork; its reconsidered decision that Mongillo acted without apparent authority does not smack of the heedless manipulation which leaps off the printed page in the Third Circuit's rendition of *Riley.* [13]

Nor is this argument substantially fortified by the celerity with which the jury dispatched the second set of papers. No matter how complicated the case, brevity in jury deliberations is not, in itself, a basis for scuttling a verdict. *See Marx v. Hartford Accident & Indem. Co.,* 321 F.2d 70, 71 (5th Cir.1963) (per curiam) (jury deliber-

ated for fourteen minutes); *Segars v. Atlantic Coast Line R.R. Co.,* 286 F.2d 767, 770 (4th Cir.1961) (jury deliberated for four minutes); *Cuthbertson v. Clark Equip. Co.,* 448 A.2d 315, 316–17 (Me.1982) (jury deliberated for sixteen minutes after eight-day trial wherein seventy exhibits were introduced and judge's charge ran forty pages). Courts cannot hold a stopwatch over a deliberating jury. Rather, the jury's work product must tell the tale. If the answers to special questions, and the verdict itself, are consistent with the weight of the evidence, and no other red flags are flying, the rapidity or languor with which the jury acts is an irrelevance.

## VII. MONGILLO'S REMAINING REASONS OF APPEAL

We turn last to Mongillo's remaining assignments of error. None have much substance.

### A. *Denial of Post–Trial Motions.*

■ Mongillo moved for judgment n.o.v. or in the alternative for a new trial. Both motions were denied. He argues now, as he did below, that various conditions precedent to the loan agreement between FRG and Union Trust had not been satisfied. These conditions required the borrower *inter alia* to pony up $300,000 and tender a $1,000,000 letter of credit at the closing. Neither the cash nor the letter of credit was produced. On this basis, Mongillo contends that he should not be held liable for the anticipated benefits of a deal that would in any event have collapsed.

■ The standard under which we review the denial of judgment n.o.v. is the same as for a directed verdict. *See Wagenmann,* 829 F.2d at 200. In fine, the evidence and all reasonable inferences extractable therefrom must be examined in the light most favorable to the nonmovant

---

**13.** *Riley* is also distinguishable on a more basic ground. The case involved Fed.R.Civ.P. 49(a), while our case involves Rule 49(b). The former rule, unlike the latter, does not explicitly provide for resubmission of inconsistent answers to the jury. While resubmission may, at times, be

proper in a Rule 49(a) case, *see, e.g., Mateyko v. Felix,* 913 F.2d 744, 746–47 (9th Cir.1990), Rule 49(b) better anticipates the kind of conflict that often arises, and consequently, gives more leeway to the jury's reconciliation of inconsistencies.

and "[a] judgment notwithstanding the verdict should be granted only when the evidence, viewed from this perspective, is such that reasonable persons could reach but one conclusion." *Id.* Mongillo cannot clear this hurdle. There was repeated testimony that literal compliance with the conditions of the bank's commitment letter had been waived. In light of this evidence, and because the standard of review prohibits us from considering the credibility of witnesses or assaying the weight of the evidence, we, like the trial court, must bow to the jury's resolution of the disputed fact.[14]

The terrain is scarcely more hospitable to Mongillo with respect to the denial of his new trial motion:

> It is well settled that the district court should order a new trial only when convinced that the clear weight of the evidence so requires or that a miscarriage of justice would otherwise result. The standard which governs our review is equally plain. We will reverse the denial of such a motion only for abuse of discretion.

*Real v. Hogan,* 828 F.2d 58, 61 (1st Cir. 1987) (citations omitted).

The trial court did not abuse its discretion in this instance. As already mentioned, plausible evidence was offered on the issue of the bank's waiver of the transactional conditions. In light of this evidence, it cannot be said that a verdict against Mongillo necessarily reflected evidentiary disregard or constituted a miscarriage of justice. *See Freeman,* 865 F.2d at 1333–34 ("The mere fact that a contrary verdict may have been equally—or even more easily—supportable furnishes no cognizable ground for granting a new trial. If

the weight of the evidence is not grotesquely lopsided, it is irrelevant that the judge, were he sitting jury-waived, would likely have found the other way.").

## B. *Jury Instructions.*

Mongillo next asserts that the magistrate erred in instructing the jury on the issue of damages. He does not take issue with the damage instructions actually given, but assigns error to the refusal to instruct the jury that, in assessing damages, it should consider FRG's lack of experience in running a time-share resort. Under well settled precedent, however, the charge must be viewed as a whole, bearing in mind that the presider is not obligated to tailor the instructions to suit a party's preference or fit the idiosyncratic facts of the particular case. *See Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 201 (1st Cir. 1980). "As long the judge's instruction properly apprises the jury of the applicable law, failure to give the exact instruction requested does not prejudice the objecting party." *McKinnon v. Skil Corp.,* 638 F.2d 270, 274 (1st Cir.1981). So here. The instructions given in this case stated the law correctly and required no further elaboration.

## C. *Damages.*

In a related vein, Mongillo tells us that the evidence did not support the jury's assessment of damages. More specifically, he asseverates that the concept of equity is "meaningless" in the time-share business unless one takes into account the skill of management. Absent evidence that FRG had the ability to run an operation like

---

**14.** Mongillo's contention that the jury could not find a waiver of these conditions because waiver must be premised upon "clear, decisive, and unequivocal conduct," *Glynn v. Gloucester,* 9 Mass.App.Ct. 454, 401 N.E.2d 886, 892 (1980), borders on the absurd. The cases Mongillo cites relate to situations where one party to a written agreement seeks to skirt a provision in it on the ground that the other party let the provision go by the boards. *See, e.g., Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 992 (1st Cir.1988). The rule has no application whatever when, as here,

the parties to the written contract (in this instance, the loan commitment) have mutually agreed to waive certain contractual conditions, yet a stranger to the contract questions the veracity of their jointly held position. *Cf., e.g., Pstragowski v. Metropolitan Life Ins. Co.,* 553 F.2d 1, 4–5 (1st Cir.1977) ("It has never been the case that a nonparty to a contract has had a remedy for breach of contract whenever the performance of the contract would have made it possible for the nonparty to receive a pecuniary benefit.").

Veranda Beach, the damages awarded lacked a stable foundation.

As a matter of economic reality, the value of skillful management cannot be gainsaid. But, skill is only one of many such salient factors—diligence, experience, enthusiasm, timing, luck, to name a few. To the extent that one attribute is thought to deserve greater weight, the plea for it should be made to the factfinders rather than to an appellate tribunal. Such a rule is especially appropriate in regard to damage awards. After all, translating legal damage into money damages is, virtually by definition, an imprecise affair. There are often many different ways of looking at the question and many different methods, all legally satisfactory, for measuring damages. *See Northern Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 473–74 (1st Cir.1988); *In re San Juan Hotel Corp.*, 847 F.2d 931, 937–38 (1st Cir.1988); *Sullivan v. O'Connor*, 363 Mass. 579, 296 N.E.2d 183, 186–89 & nn. 3–6 (1973); *John Hetherington & Sons, Ltd. v. William Firth Co.*, 210 Mass. 8, 95 N.E. 961, 964 (1911). This case illustrates the point.

There was evidence proffered below, mainly through one of plaintiff's experts, that FRG would have gained an equity position worth $2,300,000 had its planned acquisition of Veranda Beach been consummated. During a vigorous cross-examination of this witness, Mongillo's counsel highlighted the same weaknesses that he now trumpets on appeal. Once the threshold of sufficiency has been crossed, the credibility of a claimant and its witnesses presents a question for the jury, not for the trial court—and most of all, not for the court of appeals. *See, e.g., Clark v. Taylor*, 710 F.2d 4, 14 (1st Cir.1983). It is not our role, from the sterile environs of an algid record, to substitute our views for those of the jury.

To say more would be an exercise in redundancy. Juries are "free to run the whole gamut of euphonious notes—to harmonize the verdict at the highest or lowest points for which there is a sound evidentiary predicate, or anywhere in between—so long as the end result does not violate the conscience of the court or strike such a dissonant chord that justice would be denied were the judgment permitted to stand." *Milone v. Moceri Family, Inc.*, 847 F.2d 35, 37 (1st Cir.1988). That wide-ranging mandate was not exceeded here.

### D. *The Chapter 93A Claim.*

Mongillo's attack on the damages assessed against him has yet another dimension. In a written decision issued after the jury verdict, the court entered judgment for $4,000,000 against Mongillo pursuant to Mass.Gen.L. ch. 93A.[15] The court found as fact that Mongillo engaged in unfair and deceptive practices; that the Veranda Beach purchase would have been consummated but for his wrongful conduct; that FRG acted reasonably in pursuing the Western Surety bond after the aborted closing (rather than abandoning that quest and exploring new avenues); and that, by the time Western Surety informed FRG that it would not honor the bond, the seller had decided to cancel the purchase agreement. The court found the consequent damage to FRG to be $2,000,000, which it doubled because, in its view, Mongillo had acted willfully and knowingly.

By way of background, we acknowledge that Chapter 93A "is a statute of broad impact whose basic policy is to ensure an equitable relationship between consumers and persons engaged in business." *Heller v. Silverbranch Constr. Corp.*, 376 Mass. 621, 382 N.E.2d 1065, 1069 (1978). In general, it proscribes "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen.L. ch. 93A, § 2. *See generally Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 489 N.E.2d 185, 196 (1986); *Heller*, 382 N.E.2d at 1069. It is by now axiomatic that claims of unfair or deceptive acts associated with common law fraud or breach of contract may be brought under the aegis of Chapter 93A. *See, e.g., Datacomm*, 489 N.E.2d at 197 (fraud); *Burnham v. Mark IV Homes, Inc.*, 387

15. The Chapter 93A claims against the other defendants were unproductive.

Mass. 575, 441 N.E.2d 1027, 1031 (1982) (contract). Chapter 93A claims are triable to the court, not to a jury. *Norwood v. Adams–Russell Co.*, 401 Mass. 677, 519 N.E.2d 253, 254 n. 3 (1988). If the court finds that the conduct constituted "a willful or knowing violation," it must award up to two, but not more than three, times the amount of actual damages. Mass.Gen.L. ch. 93A, § 11; *see also Datacomm*, 489 N.E.2d at 197.

In these appeals, Mongillo's principal contention involving Chapter 93A is that the magistrate erred in assessing damages because the loss caused by the fraud should have been restricted to the cost of a replacement bond (there was some testimony intimating that a bond was available elsewhere, but at a higher premium), not the loss of the vanished equity. Accepting this contention would require us to disregard the magistrate's explicit finding that FRG properly mitigated its damages after the failed closing—a finding bottomed on abundant evidence. A party charged with mitigating damages is not obliged to play the seer, choosing the course of action that would, in hindsight, have turned out best. *See Burnham*, 441 N.E.2d at 1034 (plaintiff must exercise "reasonable precautions," but not more, to mitigate damages caused by defendant's breach). Here, FRG acted reasonably in its efforts to salvage the deal. No more was exigible. Accordingly, we decline to disturb the Chapter 93A damage assessment.

## VIII. CONCLUSION

We need go no further. Our painstaking trek through the voluminous record leaves us fully convinced that the parties received a fair trial, untainted by significant legal error. Thus, we leave the judgment undisturbed.

*Affirmed. Costs will be taxed against the respective appellants.*

APPENDIX

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action Nos.
84-2586-Y
84-3241-Y

VERANDA BEACH CLUB LIMITED
PARTNERSHIP, ET AL.

Plaintiffs

v.

WESTERN SURETY COMPANY, ET AL.

Defendants

QUESTIONS TO BE ANSWERED BY THE JURY

1. DID THE DEFENDANT, ROBERT F. MONGILLO, BREACH A CONTRACT TO PROVIDE A VALID BOND WITH EITHER OR BOTH OF THE PLAINTIFFS ?

YES ✓ NO ___

1a.  IF YOUR ANSWER TO QUESTION NUMBER 1 IS IN THE NEGATIVE BECAUSE YOU HAVE DETERMINED THAT THERE WAS NO CONTRACT FOR WANT OF AN OFFER AND ACCEPTANCE, OR FOR WANT OF CONSIDERATION, SHOULD THE DEFENDANT ROBERT MONGILLO BE ESTOPPED--THAT IS PRECLUDED--FROM AVOIDING HIS PROMISE TO PERFORM UNDER THE DOCTRINE OF PROMISSORY ESTOPPEL AS THAT DOCTRINE HAS BEEN PREVIOUSLY EXPLAINED ?

                                        YES ___ NO ___

2.  DID THE DEFENDANT, ROBERT F. MONGILLO, MAKE FRAUDULENT OR NEGLIGENTLY FALSE PROMISES TO PROVIDE A VALID BOND TO EITHER OR BOTH OF THE PLAINTIFFS ?                    YES ✓ NO ___

[IF ANSWERS TO QUESTIONS NUMBERED 1, 1a AND 2 ARE ALL IN THE NEGATIVE, THE FOREPERSON SHALL SIGN AND DATE BELOW, AND SHALL SIGN VERDICT SLIP NUMBER 1 AND SHALL PROCEED NO FURTHER; OTHERWISE, THE QUESTIONS BELOW, TO THE EXTENT APPLICABLE, SHALL BE ANSWERED, AND THIS QUESTION SLIP SHALL THEN BE SIGNED AND DATED BY THE FOREPERSON)

3.  IF THE ANSWER TO QUESTION NUMBER 1 OR 1a IS IN THE AFFIRMATIVE, DID THE DEFENDANT ROBERT F. MONGILLO ENTER INTO THE CONTRACT OR MAKE THE PROMISE WITH THE APPARENT AUTHORITY OF HIS PRINCIPAL, THE DEFENDANT WESTERN SURETY COMPANY ?

                                        YES ✓ NO ___

4.  IF THE ANSWER TO QUESTION NUMBER 2 IS IN THE AFFIRMATIVE, DID THE DEFENDANT ROBERT F. MONGILLO MAKE THE FRAUDULENT OR NEGLIGENTLY FALSE PROMISES WITH AN INTENT OR PURPOSE, AT LEAST IN PART, TO SERVE HIS PRINCIPAL, THE DEFENDANT WESTERN SURETY COMPANY ?                     YES ___ NO ✓

4a.  IF THE ANSWER TO QUESTION NUMBER 2 IS IN THE AFFIRMATIVE, DID THE DEFENDANT ROBERT F. MONGILLO MAKE THE FRAUDULENT OR NEGLIGENTLY FALSE PROMISES WITH THE APPARENT AUTHORITY OF HIS PRINCIPAL, THE DEFENDANT WESTERN SURETY COMPANY ?

                                        YES ✓ NO ___

5. IF YOUR ANSWER TO QUESTION NUMBER 1, 1a OR TO QUESTION NUMBER 2 IS IN THE AFFIRMATIVE, WHAT DAMAGES DO YOU FIND THAT PLAINTIFF OR PLAINTIFFS HAVE SUSTAINED ?    $ 2.3 million

6. IF YOUR ANSWER TO QUESTION NUMBER 1, 1a, OR TO QUESTION NUMBER 2 IS IN THE AFFIRMATIVE, DID PLAINTIFF FRG., INC. AND FANEUIL HALL CAPITAL GROUP, INC., ENTER INTO A CONTRACT, THE TERMS OF WHICH PROVIDED THAT EACH WAS JOINT VENTURER IN THE ACQUISITION OF THE VERANDA BEACH CLUB PROPERTY ?    YES ___ NO ✓

7. IF YOUR ANSWER TO QUESTION NUMBER 6 IS IN THE AFFIRMATIVE, AND IF YOUR ANSWER TO QUESTION NUMBER 1 OR QUESTION NO. 1a IS IN THE AFFIRMATIVE, DID ROBERT F. MONGILLO INTEND FANEUIL HALL CAPITAL GROUP, INC., TO BE THE INTENDED BENEFICIARY OF HIS PROMISE ?
YES ___ NO ✓

8. IF YOUR ANSWER TO QUESTION NUMBER 6 IS IN THE AFFIRMATIVE, AND IF YOUR ANSWER TO QUESTION NUMBER 2 IS IN THE AFFIRMATIVE, DID THE DEFENDANT ROBERT F. MONGILLO MAKE THE FRAUDULENT OR NEGLIGENT MISREPRESENTATIONS UNDERSTANDING THAT FANEUIL HALL CAPITAL GROUP, INC., WAS A PRINCIPAL IN THE VERANDA BEACH PROPERTY ACQUISITION, AND NOT MERELY AN AGENT FOR FRG, INC., AND/OR VERANDA BEACH CLUB LIMITED PARTNERSHIP ?    YES ___ NO ✓

10. IF YOUR ANSWER TO QUESTION NUMBER 7 OR TO QUESTION NUMBER 8 IS IN THE AFFIRMATIVE, WHAT PORTION OF THE DAMAGES SET FORTH IN YOUR ANSWER TO QUESTION NUMBER 5 SHALL BE AWARDED TO EACH:

FRG, INC.                              $ _____
FANEUIL HALL CAPITAL GROUP, INC.       $ _____

_Janice Doheny_
FOREPERSON

NOTE:  These are the special questions and the answers thereto as originally returned by the jury. After redeliberation, all answers remained the same, except that the jury answered Questions No. 3 and 4a in the negative rather than in the affirmative.

DISTRICT OF MASSACHUSETTS

vil Action Nos.
.4-3241-Y

VERANDA BEACH CLUB LIMITED
PARTNERSHIP, ET AL.

Plaintiffs

v.

WESTERN SURETY COMPANY, ET AL.

Defendants

VERDICT SLIP NO. 2

We, the Jury, on the claims brought by the plaintiffs against
defendants in the above entitled case, find for the plaintiff(s)
F. R. G. Inc. and _____ and against
defendant(s) Robert F. Mongill and _____ in
amount of $ 2.3 million .

Janice Doherty
FOREPERSON

DATED: October 13, 1989

NOTE:   This is the verdict as returned by the jury on both
occasions (originally and after redeliberation).